Argued and submitted June 6, accused reprimanded July 24, 1984

In re Complaint as to the Conduct of

## CHRISTOPHER A. BISHOP,
*Accused.*

(OSB 82-51, SC S30282)

686 P2d 350

Craig D. White, Portland, argued the cause and filed a brief for the Accused.

Gary L. Tyler, Portland, argued the cause for the Oregon State Bar. With him on the brief were Charles D. Ruttan and Dunn, Carney, Allen, Higgins & Tongue, Portland.

## PER CURIAM

This disciplinary proceeding concerns various aspects of the Disciplinary Rules contained in the Code of Professional Responsibility for effecting the admonition of Canon 5: "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." The complaint of the Oregon State Bar is in three causes. All causes arise out of the accused's dealings with Mrs. Hartmann. The specific charges of unethical conduct are more easily understood against the background of what actually occurred; therefore, we shall set forth our basic findings of historical fact based upon admissions in the pleadings and our independent examination of the evidence.[1]

The accused had had an attorney-client relationship with Mr. and Mrs. Hartmann for several years with respect to various legal matters prior to their separation in 1980. They consulted the accused for advice with respect to dissolution of their marriage. He agreed to assist them with preparation of a joint petition for dissolution only if they were in complete agreement on the terms of the dissolution and division of the marital property. He warned them that if they could not agree, he would have to leave them both to find other lawyers. The marriage was not dissolved until August, 1981.

Prior to the time when the joint petition for dissolution was prepared and filed, Mrs. Hartmann approached the accused in February, 1981, advising him that she had met two brothers named Edgmon and that she proposed to form a partnership with them for the production of two country-western shows to be called "Sunday in the Country" and to be held on June 21 and 28, 1981, in the State of Washington.[2] Mrs. Hartmann was to contribute $15,000 to the venture, and the Edgmons were to contribute experience, time and effort. Mrs. Hartmann was to have a 25% share of any profits. Mrs. Hartmann asked the accused to prepare a partnership agreement for the venture.

---

[1] We shall make some further findings of fact in the text of this opinion at appropriate places.

[2] One of the marital assets of the Hartmanns was a farm or ranch on which Mrs. Hartmann raised show horses, and she believed that the proposed productions would draw favorable attention to her business in that respect.

The accused informed Mrs. Hartmann that he thought the venture was risky and that it was not something in which he would invest his own funds. He further advised her that she should have an equal share in the partnership.

Mrs. Hartmann sought to borrow the $15,000 from a bank, but the bank would not make the loan unless she could find an approved co-obligor. She asked the accused to become guarantor. He hesitated, desiring to consider the matter with his wife. He then offered to act as guarantor if Mrs. Hartmann would make a $2,500 payment on attorney fees in connection with the dissolution and enter into a "co-sign" agreement, under which he expected to obtain financial recompense for acting as guarantor. She agreed to do so, and he prepared an agreement. She paid the $2,500 and signed the agreement. It provided that in consideration of his guaranty of her obligation to the bank

"Hartmann shall pay over to co-signor, on or before 1st day of July, 1981 the sum of $500 or 8 1/2 % of all profits of that certain western-show partnership enterprise * * * profits to be determined as per the partnership agreement, * * *. Such profits shall be paid from Hartmann's share."[3]

The agreement also provided that the parties agreed that the accused did not become a partner in the enterprise. The agreement further provided that if Hartmann failed to pay the obligation to the bank, thus requiring the accused to pay it, she would promptly repay him or give him such security as he might reasonably demand for her obligation to him.

Prior to the time that Mrs. Hartmann and the accused signed the co-sign agreement, Mrs. Hartmann and the Edgmons came to the accused's office. The Edgmons agreed that Mrs. Hartmann should have a full one-third interest in the profits. Everyone agreed that the accused would prepare a partnership agreement for the venture, and the accused discussed various aspects of the venture with them.

---

[3] Ambiguity is readily apparent. The agreement does not provide whether Hartmann or the accused is to make the choice between paying $500 or the percentage of profits. If it were Hartmann's choice, $500 would be a ceiling on her obligation; if it were the accused's choice, $500 would be a floor. For the purpose of this opinion, we treat the sum of $500 as being her obligation, for the accused testified that when the bank officer asked him if he was going to be compensated for the guaranty, he answered that he would receive $500.

The accused did prepare a partnership agreement. That agreement, the guaranty and the co-sign agreement were all signed on March 11, 1981. The accused was paid for his services in drafting the partnership agreement from the partnership bank account.

The partnership agreement provided that the partnership agreed to assume and pay the obligation at the bank and to hold Mrs. Hartmann harmless on that obligation. Profits were defined to be the sum left over after payment of all expenses, including payment of the obligation to the bank.

After the venture was under way, Mrs. Hartmann came to the accused to complain that partnership funds were being disbursed by Edgmons without their satisfying her that the funds were being used for partnership purposes.[4] She also expressed fear that the Edgmons might divert money from advance ticket sales by ticket agents. The accused, without consulting the Edgmons, wrote a letter to the agents advising them that receipts from the ticket sales were to be sent to the accused's office by check made payable to the order of "Edgmon, Edgmon and Hartmann." When one of the Edgmons learned of the letter, he remonstrated with the accused that the letter cast aspersions on his honesty. The accused was able to mollify him and to convince him that no aspersion was intended.

"Sunday in the Country" was a financial failure, and the partnership funds were completely depleted. Mrs. Hartmann asked the accused to represent her in attempting to enforce the Edgmons' duties to her. He refused, informing her that he had acted as attorney for the partnership and could not represent any partner against another.

The accused continued to give legal advice to the Hartmanns concerning the dissolution. He prepared a joint petition for dissolution when the division of marital assets had been agreed upon, and they obtained a dissolution on that petition.

Mrs. Hartmann did not pay the obligation to the bank, and in December, 1981, the accused paid in accordance

---

[4] Checks could not be drawn on the partnership bank account without all three partners' signatures; therefore, this complaint is somewhat hard to understand.

with his guaranty and demanded of Mrs. Hartmann that she either reimburse him or that she give him a "second position" with the ranch to secure her debt to him.

## FIRST CAUSE

The first cause alleged in the Bar's complaint is that the accused violated DR 5-101(A).[5] The cause alleged:

"The Accused failed to obtain the consent of his client, Mrs. Hartmann, after full disclosure, prior to undertaking to handle the legal affairs of the Hartmann-Edgmon partnership when his professional judgment on behalf of Mrs. Hartmann was or reasonably may have been expected to be affected by the Accused's financial, business, property, or personal interests."

We are clearly convinced that the accused acted as attorney for the partnership, that Mrs. Hartmann believed that he was acting as her attorney and that his actions with respect to her complaints concerning partnership funds did nothing to dispel that belief.

Neither do we have any doubt that the accused's financial, business or property interests reasonably were to be expected to be affected by advice that he might give to Mrs. Hartmann. He had become her guarantor for hire, and the success or failure of the enterprise had a direct bearing on whether he would be called upon to perform his contract of guaranty with the bank.

The Bar takes the position that the accused was acting as attorney for both Mrs. Hartmann individually and for the partnership, of which she was a member, all at the same time. The accused contends that in conferring with Mrs. Hartmann and the Edgmons and in drafting the partnership agreement he acted solely as attorney for the partnership and that he had told Mrs. Hartmann from the outset that he would be acting in that capacity and not as her lawyer. On the other hand, Mrs. Hartmann testified that he never told her that and

---

[5] DR 5-101(A) states:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

that she regarded him as her attorney in the matter throughout until he refused to represent her against the Edgmons.

Whether the accused violated DR 5-101(A) depends upon whether he made full disclosure to Mrs. Hartmann and obtained her consent to accept employment by the partnership. Weighing in favor of the accused is his own testimony and that of his office secretary that he unequivocally told Mrs. Hartmann that he would not be acting as her attorney in connection with the partnership venture and that the reason was that if he attempted to act as attorney for both the partnership and her his actions would be unethical as involving a conflict of interest. Their testimony also was that, just as unequivocally, he told her that he would be the partnership's attorney. That position is fortified by the fact that he was paid by the partnership for his services in conferring with Mrs. Hartmann and the Edgmons and drafting the partnership agreement.

On the other hand, Mrs. Hartmann denies that the accused ever told her that he would not be representing her in the matter and would only be representing the partnership. That version is strengthened by the fact that he did advise her concerning the risk of the venture and that she should have a full one-third share of the profits. Moreover, his action with respect to the letter to the ticket agents is more in keeping with his being her attorney than that of the partnership.

In disciplinary proceedings the Bar is required to prove the charges against an accused attorney by clear and convincing evidence. *See, e.g., In re Magar,* 296 Or 799, 681 P2d 93 (1984). That requires that we be convinced that it is highly probable that Mrs. Hartmann's version is accurate. *Cook v. Michael,* 214 Or 513, 330 P2d 1026 (1958). Giving full effect to that rule, we are unable to say that the accused failed to advise Mrs. Hartmann that he would be representing the partnership rather than her in the matter. She certainly consented to his performing the services with respect to the formation of the partnership and the writing of the letter to the ticket agents, and because we cannot find to the contrary, we must assume that she consented to his accepting employment by the partnership.

We find the accused not guilty of the charge of violation of DR 5-101(A).

## SECOND CAUSE

The second cause alleges that the accused violated DR 5-104(A).[6] Specifically, it is alleged:

> "Accused entered into a business transaction with his client, Patricia Hartmann, when he and his client had differing interests therein and when his client expected Accused to exercise his professional judgment for her protection, without obtaining his client's consent after full disclosure."

The business transaction is that in which the accused agreed for valuable consideration to become Mrs. Hartmann's guarantor on the $15,000 loan from the bank.

Throughout these proceedings the accused has taken the position that because his obligation to the bank was only contingent or inchoate, the disciplinary rule did not apply to this transaction. He misses the mark. The co-sign agreement that he prepared, which was signed by his client and by him, created a debtor/creditor relationship between his client and him. The agreement committed her to pay to him on or before a date certain the sum of $500. That obligation attached immediately and was not contingent on anything that might happen after he undertook to guaranty the payment of the bank loan. The accused did enter into a business transaction with Mrs. Hartmann.

Was she his client? He had an ongoing attorney-client relationship with her for several years previous to and throughout the entire period in connection with the marriage dissolution until the time of dissolution in August, 1981. Even if we could affirmatively find that he represented the partnership rather than her with respect to the "Sunday in the Country" venture, she was his client when he entered into the business transaction with her.

Did they have differing interests in the transaction?

> "A debtor-creditor relationship is an adverse relationship. Unquestionably, the interests of [client] and Drake were 'differing interests.'"

---

[6] DR 5-104(A) states:

"A lawyer shall not enter a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

*In re Drake,* 292 Or 704, 713-14, 642 P2d 296 (1982).

Mrs. Hartmann testified that she believed that the accused was her attorney in connection with obtaining the bank loan and the execution of the co-sign agreement. We believe her. From that fact we infer the further fact that she expected him to exercise his professional judgment in the transaction for her benefit.

As to her consent that he enter into the business transaction, there can be no doubt. The only other issue is whether he made full disclosure as required by the disciplinary rule.

Prior to the time that the accused entered into this business transaction, we had engrafted on the full disclosure element of the disciplinary rule the requirement that a lawyer at least advise his client to seek independent legal counsel.

> "Lest there be any doubt concerning that duty as being encompassed by DR 5-104, we now hold that in any situation in which a lawyer shall enter into a business transaction with his client where they have differing interests and the client expects the lawyer to exercise his professional judgment in the transaction for the protection of the client, the lawyer must *at least advise* the client to seek independent legal counsel. *Compare In re Brown,* 277 Or 121, 129, 559 P2d 884 (1977); *In re Boivin,* 271 Or 419, 427-28, 533 P2d 171 (1975)." (Emphasis in original.)

*In re Bartlett,* 283 Or 487, 496-97, 584 P2d 296 (1978). The transaction in the case at bar occurred almost three years after publication of our opinion in *Bartlett.* The closest the evidence comes to showing that the accused complied was during direct examination concerning both the enterprise and the guaranty matter:

> "Q.  Can you recall any other specific occasions in which conflict of interest —
>
> "A.  I think it's important to note that when I agreed finally, finally agreed to co-sign on this note, that I told her that, you know, that reasonable minds could differ as to — again as to whether this was a good business proposition or anything and you should even consider it. I told her I didn't like it, that I wouldn't invest in it and that I thought she should go talk to whomever you trust or an attorney of your

choice or an accountant or anybody else, as to whether or not you should get involved in this thing.

"Q. What did she say to that?

"A. She was convinced that it was a good — that it was going to be all fine.

"Q. Did she say that she wanted to see another attorney or thought that it was a good idea?

"A. I explained to her that if I was going to be in a business relationship with her that I could not be in a situation where she and I were in a conflict of interest, just like I explained to her that there couldn't be any conflict between — within the partnership."

It is far from clear that Mrs. Hartmann should realize from this that the accused was advising her to get independent legal advice with respect to the co-sign agreement as distinguished from the contemplated enterprise with the Edgmons.

That discussion between the accused and the client did not take place at the time the accused actually presented the co-sign agreement to the client for signature. The client testified that when the agreement was prepared and presented for her signature the accused did not go through the document with her, that he did not explain to her the relationship that the document created between them, that he did not discuss with her the accused's right to demand security and that he did not advise her to have the document reviewed by another attorney before she signed it. That testimony is not in conflict with the accused's testimony that he generally advised her about talking to an attorney. We find that the client's testimony concerning the presentation of the document for signature, the accused's failure to explain it to her and his failure to advise her to seek independent legal advice before signing it is true.[7]

The duty of full disclosure is not satisfied by just advising the client to obtain independent legal advice. If the

[7] The accused testified that Mrs. Hartmann read the co-sign agreement before she signed it, but he conceded that at that time he did not advise her to consult another attorney. He did not testify contrary to her testimony that he did not explain the document to her. He also testified that he did not believe that he was incurring any great risk by becoming guarantor because of his knowledge of her business affairs and property interest gleaned from his prior representation of the Hartmanns and in the marriage dissolution matter.

client does not obtain such advice, the lawyer must inform the client that their interests in the transaction are adverse. *In re Whipple,* 296 Or 105, 112-113, 673 P2d 172 (1983); *In re Drake, supra,* 292 Or at 714.

■        Even if we assume that the accused's general advice about consulting an attorney concerning the enterprise and that his testimony that he at that time pointed out to her that they had adverse interests are true, we must inquire whether he told the client that the existence of their differing interests "has or may have effects" upon his ability to exercise his professional judgment on the client's behalf. We have held such advice is necessary to satisfy the full disclosure requirement of DR 5-104(A) in *In re Drake, supra,* 292 Or at 714, and have since approved that holding in *In re Whipple, supra,* 296 Or at 112-113. We find nothing in the evidence to show that requirement was met.

Taking the evidence as a whole, we are convinced that the accused violated DR 5-104(A) as charged in the Bar's complaint in the second cause.

### THIRD CAUSE

In the third cause the Bar's complaint charges that the accused violated DR 5-105(B).[8] The specific charge is:

"Accused continued to represent multiple clients when the interests of those clients diverged without obtaining the consent of each of his clients after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

DR 5-105(B) is concerned with when a lawyer should refuse to continue employment already taken. The Bar's theory is that the accused had two clients: (1) Mrs. Hartmann

---

[8] DR 5-105(B) and (C) provide:

"(B)  A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C)  In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

and (2) the partnership of which she was a member. The Bar has never contended that the accused represented either or both of the Edgmons as such.

■ The accused's position is that with respect to partnership matters he represented only the partnership and did not represent Mrs. Hartmann. He conceded, however, that Mrs. Hartmann was his client at the same time that the enterprise was being initiated and underway:

> "THE CHAIRMAN [of the Trial Board]: But it's my understanding at the time the note was signed, and correct me if I'm wrong, at the time the co-signature agreement was signed, you were representing her in a dissolution proceeding; is that correct?
>
> "THE WITNESS [the accused]: I was representing she and Mr. Hartmann, yes.
>
> "THE CHAIRMAN: So, at the time the note was signed, you were representing her as an attorney?
>
> "THE WITNESS: Yes.
>
> "THE CHAIRMAN: It may not have been related to the partnership agreement but you were representing her as an attorney?
>
> "THE WITNESS: Yes."

It is beyond doubt, therefore, that he was representing two clients during the formation of the partnership and the securing of the financing for the venture. The rule forbids him to continue[9] in the employment of either if his independent professional judgment on behalf of one "will be or is likely to be adversely affected by his representation of" the other, unless the exception contained in DR 5-105(C) applies.

During the discussions preceding his representation of the partnership agreement, the accused took Mrs. Hartmann's part when he suggested that she should have a full third of the profits rather than the fourth to which she had agreed prior to the accused agreeing to represent the partnership. Contemporaneously, the accused was dealing with Mrs. Hartmann to obtain an interest in her share of the

---

[9] DR 5-105(A) differs in purpose and scope; it forbids accepting proffered employment if exercise of independent professional judgment on behalf of an existing client will be or is likely to be affected by acceptance of the proffered employment. The complaint does not refer to DR 5-105(A).

partnership profits, and there is no evidence that either Mrs. Hartmann or the accused ever told the Edgmons of this.[10] When Mrs. Hartmann came to the accused to complain about disbursements arranged by the Edgmons, the accused did not communicate that dissatisfaction to the other partners and thereby enable them to participate in the decision as to the manner of resolving Mrs. Hartmann's complaint. Rather, he took it upon himself to write to the ticket agents to further what Mrs. Hartmann regarded as her interest.

We find that the accused did violate DR 5-105(B) and that he did not bring himself within the exception contained in DR 5-105(C) by making disclosure to the Edgmons and obtaining their consent to continue his employment by multiple clients.

■ In comparing the unethical conduct of the accused with that of other lawyers who have been the subject of similar disciplinary proceedings in recent years, the court has come to the conclusion that a public reprimand is sufficient sanction in this matter.[11]

This opinion will serve as a public reprimand, and the Oregon State Bar is awarded judgment for all of its actual and necessary costs and disbursements incurred in this matter. ORS 9.535(4).

---

[10] The co-sign agreement recited that Mrs. Hartmann had secured the approval of the Edgmons to "this co-signing arrangement." That recital might be binding as between Mrs. Hartmann and the accused, but it is not binding as to whether Edgmons were actually advised of and approved the arrangement. Mrs. Hartmann testified that they were not and did not.

[11] The conduct of the accused with which we are here concerned antedated publication of our opinion in *In re Boyer*, 295 Or 624, 669 P2d 326 (1983). There, while ordering the accused's suspension for seven months, we said:

"[T]his particular type of unethical conduct appears to be on the rise. Deterrence thereof for the public good may be accomplished by more severe penalties for this kind of unprofessional conduct which may occur after the date this opinion is published."

295 Or at 630.