Submitted on record and brief June 2, accused suspended from practice of law for one year with conditions July 15, 1986

In re Complaint as to the Conduct of
## JAMES A. LUEBKE,
*Accused.*
(OSB 83-125, 84-52; SC S32747)
722 P2d 1221

Mark M. Williams, Assistant General Counsel, Oregon State Bar, Portland, and Christopher Hardman, Portland, for the Oregon State Bar.

No appearance contra.

PER CURIAM

## PER CURIAM

The accused is charged with violation of DR 5-104(A) in two separate transactions with two separate clients. That disciplinary rule at the time of those transactions provided:

> "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."[1]

In its first cause, the Bar alleges that a woman named Baker was the accused's client, that she lent money to a corporation in which the accused had an "ownership" interest, that the accused signed a promissory note, both as officer of the corporation and as a personal guarantor, to repay the loan, that Baker expected the accused to exercise his professional judgment for her protection and that the accused failed to obtain Baker's consent after full disclosure. The Bar further alleged that the note provided for a usurious rate of interest and would have been unenforceable as against the accused.

The accused answered that Baker was not his client, that the note did not provide for a usurious rate of interest, that he did not participate in the loan arrangements, that he did not borrow money from Baker and that he was not expected by her to render any professional judgment.

In its second cause, the Bar alleges that a woman named Murphy was the accused's client, that while she was a client she inherited about $160,000, that the accused was financially involved in a corporation named Willipa Pacific Seafoods, Inc., that Murphy lent the corporation $50,000 and later renewed the loan, that Murphy's loan was the result of conversations between the accused and Murphy, that their interests in the loan and renewal differed, that she expected him to exercise his professional judgment for her protection

---

[1] DR 5-104(A) now provides:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure. Full disclosure shall include a recommendation that the client seek independent legal advice."

and that the accused did not obtain her consent after full disclosure.

The accused answered that he was an officer and director of the corporation but had no financial interest or ownership in the business of the corporation and that Murphy did not expect him to exercise his professional judgment for her protection.

The Trial Panel found the accused guilty of both charges. The Panel suspended the accused for one year and ordered that he not be reinstated unless he successfully completed a course in legal ethics at an Oregon law school.

What we set forth as facts is the result of our statutorily required *de novo* review of the evidence and resolution of conflicts therein.

### First Cause: Baker

In the spring of 1980, Baker and her friend Erickson acquired a one-third interest in a corporation, Natco III, Inc. The interest was taken in Erickson's name alone at that time. In about August of that year they went to see the accused at his office concerning a dispute with the president of the corporation. The accused advised them concerning their rights and wrote a letter for them about the matter. They continued throughout the fall to consult the accused concerning corporate matters.

Sometime prior to November 4, 1980, the accused billed Erickson for attorney fees. The bill was paid by a check drawn by the corporation. The check had printed on it just above the signature lines: "Harold E. Erickson & Geneva G. Baker." Both Erickson and Baker signed the check.

On November 7, 1980, the accused submitted another bill for legal services rendered in October addressed to Erickson but referring to services rendered "RE: Natco III, Inc." In December, the accused billed in the same format for services rendered in November. These services accomplished resolution of the problems Erickson and Baker were having with the other persons who had been shareholders of the corporation.

When Erickson and Baker first visited the accused, he revealed that he had a tavern that was having financial

problems. Erickson told the accused that he had operated taverns. During subsequent conversations, the accused and Erickson discussed the operation of the tavern. Erickson and Baker discussed between themselves the prospect of buying the tavern. In November, 1980, Baker learned of the existence of Lynwell, Incorporated, that the corporation was the owner and operator of the tavern and that the accused was a shareholder and officer in the corporation.

In late November or early December, Erickson began managing the tavern for Lynwell, Incorporated. The president of the corporation and Erickson understood by a "verbal" agreement that this was a prelude to sale of the tavern to Erickson. Baker became aware through personal observation and Erickson that the tavern was having financial problems. Erickson told Baker that the tavern could be helped by an infusion of cash, which "might get the Earth Tavern going a little bit more."

Baker then ascertained that banks in the area were making business loans at an interest rate of about 21 or 22 percent. She decided that she would lend $10,000 to help the business. No one asked her to lend money. She discussed the matter with the accused, and they agreed that interest would be paid at the rate of 21 percent per annum and that the accused would guarantee the corporation's obligation.

A note was prepared.[2] The note was dated January 19, 1981, and called for monthly payments, including interest at the rate of 21 percent per annum. The note was prepared in a form for corporate signature by the secretary and president of the corporation and the personal signatures of the three shareholders.

Baker took the note to the president, who signed in that capacity and personally. She then took the note to the accused, who signed as secretary and personally. The other shareholder never signed.

There was no security for the loan other than the

---

[2] Baker testified that the accused prepared the note. The accused testified that he did not and that the first time he saw the note was when Baker brought it to him to sign. We cannot say where the truth lies.

personal guarantees of the accused and the corporation's president.

The loan proceeds were used in the operation of the tavern and not for the personal use of either the accused or the president.

At no time prior to making the loan did the accused advise Baker to get any independent advice, either legal or financial. He did not advise her that she and he had conflicting interests in the transaction. She believed the accused to be her attorney because of the prior dealings in connection with Natco III, Inc.

From her own observations of the accused's conduct during the fall of 1980, Baker believed that the accused was financially able to pay $10,000 if called upon to do so. She did not ask the accused about his financial condition, and she made no investigation in that respect.

At the time the note was signed, the rate of interest was usurious as to the personal obligations of the accused and the co-guarantor. Baker knew nothing about the law of usury, and the accused did not discuss it with her.[3]

Some payments were made on the note out of tavern receipts. Eventually, both the corporation and the accused failed financially, and the accused took personal bankruptcy. Baker lost about $8,000 of the money that she lent.

Based on those historical facts, we find that the accused entered into a business transaction with Baker and that she was his client.[4] They had differing interests in the transaction. The accused did not make the full disclosure called for by the rule.

For a lawyer to be in violation of DR 5-104(A), however, more is required. It must be shown that the client expected the lawyer to exercise his professional judgment in the transaction for the protection of the client.

---

[3] The accused testified that he did not consider the rate to be usurious because the corporation was the maker of the note.

[4] During opening statement to the Trial Panel, the accused's counsel stated that the accused "did not represent Baker directly but technically she would be a client." We would find that she was his client even without that concession.

The Trial Panel's findings of fact are silent as to whether Baker had that expectation. The Panel's conclusions state: "Baker clearly felt that the Accused was her lawyer and she correctly expected him to use his professional judgment to protect her interest."

In its brief in this court, the Bar asserts that Baker expected the accused to protect her interest by the exercise of his professional judgment, but the Bar does not direct our attention to any evidence directly dealing with that element of DR 5-104(A).

We cannot find any testimony or documentary evidence that directly proves that Baker had that expectation. She was not directly asked a question that would evoke evidence of that kind. She was asked directly if she trusted the accused, and we infer from her answer and the tenor of her whole testimony that she did.[5] That is not the same, however, as expecting that he was going to exercise his professional judgment for her protection.

The Bar argues that we should infer that Baker had the requisite expectation, citing *In re Bishop,* 297 Or 479, 686 P2d 350 (1984); *In re Whipple,* 296 Or 105, 673 P2d 172 (1983); *In re Montgomery,* 292 Or 796, 643 P2d 338 (1982).

In *Montgomery,* which involved a loan at a usurious interest rate from a client to the lawyer, the determinative question was whether there was clear and convincing evidence that the client had the expectation required by the rule. We found, in the absence of direct evidence, that the client was relying on the lawyer's professional judgment that the note was valid and legally enforceable. We said:

---

[5] On redirect examination of Baker, the following occurred:

"Q. You indicated under cross examination that you were very naive about this particular transaction with Mr. Luebke in not asking him about his personal ability to pay the loan or the note. Why didn't you ask him, why didn't you go into detail about his personal ability to pay?

"A. Because I felt he could pay, that's why.

"Q. Okay. Did you trust Mr. Luebke?

"A. I mean, the reason I said I am naive is because I know from behindsite [sic] now."

Bar counsel did not pursue his inquiry.

"When a lawyer borrows money from a non-lawyer client who is not in the business of lending money, the lawyer should assume that the client is relying on the lawyer for the legal aspects of the transaction to the same extent that the client would rely on the lawyer for advice were the client making the loan to a third person, unless the opposite is expressly stated.

"It would not occur to a trusting client that the lawyer would advise the client to enter into an unlawful contract. Thus, had BLT consulted Montgomery about a loan to a third person, although advice as to the creditworthiness of the third person would likely not be expected, advice as to the legal effect of the usurious rate of interest would likely have been given. In addition, a competent lawyer might have recommended that security be given by the borrower.

"In many situations the client would not be dealing with the lawyer but for the client's trust and confidence in the lawyer born of past associations. This trust is indispensable in some lawyer-client relationships. Requiring the lawyer-borrower to assume that the client is relying on the lawyer as to the legal aspects of the transaction is consistent with the realities of the situation, and perhaps more importantly, will tend to maintain a healthy, above-board relationship between the lawyer and the client with maximum protection to the client.

"The evidence in this case is clear that MacLellan was unaware of the significance of the usurious interest rate. We are convinced that had Montgomery advised him of the consequences of usury, or had MacLellan sought outside legal advice, the loan in this form would not have been made. We find that the requirements of the third clause [the client's expectation] have been met."

292 Or at 802-03.

In *Whipple* we were concerned with a client's unsecured loan to the lawyer at a usurious rate of interest. The client testified that he believed that the lawyer was representing the client's interests in the transaction and that he expected that the lawyer would prepare a legally enforceable note. The issue before us was not whether the client had the expectation required by the rule but whether there had been the necessary full disclosure.

In *Bishop* the lawyer entered into a transaction with his client which made her his debtor. We believed the client's testimony that she believed the lawyer was her attorney in

connection with the transaction involving a bank that led to the creation of the debtor/creditor relationship between client and lawyer. We then inferred the further fact that the client had the requisite expectation to bring the rule into play.

There is no less reason in this case for drawing the inference that we drew in *Bishop*. The reasons we gave in *Montgomery* for drawing the inference are persuasive here. We emphasize, however, that such an inference is drawn in our role as factfinder.

We find, therefore, that the client here did expect the accused to exercise his professional judgment for her protection to the extent at least to prevent her from taking his obligation to her at an unenforceable usurious rate of interest.

Having found that all of the necessary elements have been established, we hold that the accused did violate DR 5-104(A) as charged.

### Second Cause:   Murphy

Murphy's landlord, who was acquainted with the accused, recommended that Murphy consult the accused concerning some family law problems. When Murphy went to the accused's office, she found that she was already acquainted with the accused's secretary, who was a customer where Murphy had worked as a bartender. Murphy's legal problems, for the most part, were discussed with the secretary, who was not a member of the Bar but held herself out to be a paralegal.

The accused talked to another lawyer on Murphy's behalf concerning her problems with respect to an adopted child, and the accused signed a letter prepared by his secretary to another lawyer, in which he stated that he represented Murphy.

Murphy was a person of limited financial experience and means. She had been on and off welfare from time to time. She came into an inheritance of about $160,000. Shortly before she actually received the inheritance, Murphy and the accused discussed her impending inheritance at a restaurant.

Prior to meeting Murphy, the accused had a major financial interest in a corporation called Willapa Port Fisheries located in the State of Washington. That corporation fell on hard times, and another corporation called Willapa Pacific

Seafoods Co. was organized to go forward with the business formerly operated by the first corporation. The accused, for reasons having to do with bankruptcy of the first corporation and financing the operations of the second corporation, did not formally have any interest as a shareholder in the second corporation (hereinafter called "Willapa").

The accused's mother and aunt had substantial financial interests in Willapa, either by way of investment or by furnishing collateral for a line of credit granted by a bank. The accused believed that he had an interest in certain machinery used by Willapa. He also took an active interest in the operation of the plant and the marketing of its product. The accused told Murphy that he wished that he could give up the practice of law and concentrate on the Willapa business. He was secretary of Willapa and a member of the Board of Directors.

At about the time that Murphy discussed her inheritance with the accused, Willapa needed a "heavier" line of credit, which would require additional collateral. At the restaurant meeting with Murphy, the accused discussed with her how she might invest the money to be inherited. He suggested how various percentages of her money might be invested in various ways. He marked out a major fraction for investment in Willapa.

Eventually, the accused took Murphy to the plant in Washington, where she viewed the machinery and a part of the operation. At that time, Murphy had a "crush on the accused" in the words of the accused's secretary.

The accused realized that Murphy was very unsophisticated in financial matters.

The accused advised Murphy to consult with a named stockbroker, a "collectables" investment counselor and the accused's certified public accountant before investing her money in anything. She did so. She did not understand what the stockbroker was talking about. She felt uneasy about the collectables counselor. The accountant proposed an investment scheme in a truck line that he opined would make both Murphy and the accountant rich. She did not take the advice of any of them.

She went back to the accused, who suggested that

lending money to Willapa was as safe or safer than putting it in a bank. He told her that he had some "involvement" in Willapa, as did his family, and that he was "very excited" about the business. He told her that her position with respect to investment with Willapa would be better than his own. At that time he believed that his own position was very good because Willapa's financial condition was essentially sound. He never advised her to seek independent legal counsel about such an investment.

Murphy bought five $10,000 certificates of deposit and pledged them as collateral for Willapa's line of credit with the bank. After six months, although the accused knew that Willapa's financial condition had become somewhat less sound, he advised Murphy to renew the pledge. For the first six months and about three months more, Murphy received $1,000 per month for supplying the collateral.

At about the end of the nine-month period, Willapa was the victim of a fraud, which pushed the company over the line into insolvency. Murphy eventually got back about half of her original $50,000.

At all times Murphy completely trusted the accused as to his advice concerning investment of her money.

Based on these historical facts, we find that the accused did enter into a financial transaction with Murphy. She was his client despite the fact that his secretary did the bulk of her legal work (including the preparation of a will). The accused and Murphy had differing interests in the transaction even though the accused was not actually a shareholder in Willapa. The accused never advised Murphy to seek independent legal advice. There was no full disclosure as required by the disciplinary rule.

The determinative question is whether Murphy expected the accused to exercise his professional judgment for the protection of her interest in the transaction. Again, there is no direct evidence that she did. We infer, however, for the same reasons discussed with respect to the first cause, that she did have that expectation.[6]

---

[6] We direct the Bar to find out from a client, where possible, whether the client did expect the lawyer to exercise the lawyer's professional judgment in the transaction for the protection of the client. If the client did not, no charge lies under DR 5-104(A). If the client did, that should be directly elicited before the Trial Panel.

We hold that the accused violated DR 5-104(A) as charged.

## The Sanction

The Trial Panel ordered a one year suspension and that as a condition of reinstatement the accused be required "to successfully complete" a course in legal ethics at an accredited Oregon law school. The Bar petitions us to do the same.

Our attention has recently been directed to standards adopted by the American Bar Association for imposing lawyer sanctions. These standards are designed to provide an analytical framework for courts to decide what should be an appropriate sanction for violation of the disciplinary rules. We are disposed to use those standards, insofar as we find them to be applicable and persuasive. *In re Bristow,* 301 Or 194, 721 P2d 437 (1986).

Those standards provide that the court should consider the duty violated, the lawyer's mental state, the potential or actual injury caused by the violation and the existence of aggravating or mitigating factors.

Here, the duty violated was that of loyalty to a client by failing to avoid conflicts of interest.

We find that this accused intended that a loan be made from his client to a corporation in which he (and in the Murphy cause, his close family) had a substantial financial interest. He also intended not to make that full disclosure required by our decision in *In re Bartlett,* 283 Or 487, 584 P2d 296 (1978), in that he did not *"at least advise* the client to seek independent legal counsel." (Emphasis in original.) 283 Or at 496-97. In the Baker case the accused knew that there was a substantial risk that the client would suffer serious financial injury.[7] On the other hand, Baker knew, just as well as the

---

[7] The standards define "injury" and "potential injury":

"Injury is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from serious injury to little or no injury; a reference to injury alone indicates any level of injury greater than little or no injury.

"Potential injury is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

accused did, of the bleak financial picture of the corporation to which she volunteered the loan. In the Murphy case the accused intended that the loan be made, but at that time he believed the financial condition of the corporation to be good. We do not believe that he intended harm to Murphy; indeed, he believed that Murphy and other persons financially interested in Willapa would prosper. Injury to Murphy's property interests was not reasonably foreseeable at the time of the original pledge. The evidence does not convince us to a high degree of probability that injury to Murphy's property interests was reasonably foreseeable even at the time of renewal of the pledge.

As to actual injury, Baker lost 80 percent of her $10,000, and Murphy lost about 50 percent of her $50,000. In light of those substantial "harm[s]" we see no reason to examine potential injury.

The standards provide that after violation (or misconduct) has been established aggravating and mitigating circumstances "may" be considered in deciding what sanction to impose. They provide:

"9.2 Aggravation

"9.21   Definition. Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed.

"9.22   Factors which may be considered in aggravation.

"Aggravating factors include:

"(a)   prior disciplinary offenses;

"(b)   dishonest or selfish motive;

"(c)   a pattern of misconduct;

"(d)   multiple offenses;

"(e)   bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

"(f)   submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

"(g)   refusal to acknowledge wrongful nature of conduct;

"(h)    vulnerability of victim;

"(i)    substantial experience in the practice of law;

"(j)    indifference to making restitution. .

"9.3 Mitigation

"9.31   Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

"9.32   Factors which may be considered in mitigation.

"Mitigating factors include:

"(a)    absence of a prior disciplinary record;

"(b)    absence of a dishonest or selfish motive;

"(c)    personal or emotional problems;

"(d)    timely good faith effort to make restitution or to rectify consequences of misconduct;

"(e)    full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

"(f)    inexperience in the practice of law;

"(g)    character or reputation;

"(h)    physical or mental disability or impairment;

"(i)    delay in disciplinary proceedings;

"(j)    interim rehabilitation;

"(k)    imposition of other penalties or sanctions;

"(l)    remorse;

"(m)    remoteness of prior offenses."

Before applying these factors we emphasize that the facts we found with respect to these charges are the result of our resolving conflicts in the evidence. In many important respects the evidence of the Bar and of the accused were almost diametrically opposed. Because the burden of proof on the Bar is that of clear and convincing evidence we have given the benefit of the doubt to the accused's version of events in several important respects. In other respects, however, we simply do not believe the accused's version where it sharply contrasts with that of the Bar's evidence.

A good example is that concerning what advice was given to Murphy. The client testified that the accused, at the restaurant meeting mentioned above, drew a "pie" and indicated the sizes of slices into which the client might divide her investments from her inheritance. She testified that the accused identified investment in Willapa as a very large slice of the pie. She testified that the accused told her the investment would be safer than in a bank. She testified that the accused never tried to talk her out of investing in Willapa. The accused testified to the contrary. He swore that he tried to dissuade Murphy from an investment in Willapa, not only before he referred her to financial advisors named by him, but also afterwards. Speaking of Murphy's desire to invest almost one-third of her inheritance after talking to those advisors, the accused testified:

"A.   I recall her coming back after she had talked to those people. And I recall her being gone for a period of maybe two weeks and then coming back and advising that she was going to put her money in that plant.[8]

"Q.   And did she tell you at that time how much she was going to put in?

"A.   She had made up her mind as to how much and that she was going to do it.

"Q.   Did you ever ask her for any specific amount?

"A.   No, not at all.

"Q.   And what amount did she tell you?

"A.   She said $50,000.

"Q.   Did you have any discussion with her about that amount?

"A.   Well, I really didn't like the idea of her putting money in because I have been informed that her advisor or people who had been advising her not to do so, and I told her that. And contrary to what some other testimony, it's true that I did attempt to dissuade her but not to the point of refusing to accept it."

The accused testified before the Trial Panel some two months before Murphy testified that he did not attempt to dissuade her and, in fact, encouraged her investment. This is not the

---

[8]It should be remembered that this was not a corporation in which one could invest by buying stock or bonds on the open market.

only contradiction that we find important and in which we have rejected the accused's version of events.[9]

Turning to aggravating factors listed in the standards, we find some selfish motive in the accused's conduct with respect to both charges. There is a pattern of misconduct in that the same sort of thing happened twice; likewise these constitute multiple offenses. The accused, at the least, testified to what we find did not happen. He has not, of course, acknowledged the wrongful nature of his conduct because his version of what happened would not constitute wrongful conduct. Murphy was naive and a financial babe in the woods; Baker was not. The accused was admitted to practice in 1965; he was not inexperienced. The record shows nothing but indifference to making restitution to these clients.

A further matter of aggravation we find from the testimony of Murphy. She apparently felt that her experience in trying to recoup her money with the help of other lawyers had been disappointing. When asked if she had made a complaint to the Bar against a particular one, she answered:

> "No, I did not. I feel like complaining against all lawyers to tell you the truth, I don't trust any of them now."

The *only* mitigating factor listed in the standards that seems to fit is the absence of a prior disciplinary record of the accused.

The standards recommend disbarment for certain conduct of the nature with which we here deal:

> "4.31   Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):
>
> > "(a)   engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client;"

The standards recommend only suspension when the misconduct is "less grievous."

---

[9] The Trial Panel was in a better position to assess credibility than are we. The Panel made no express finding of want of credibility of the accused, but from the result it reached we infer that the Panel did not find the accused to be credible where his testimony was in sharp conflict with that of his clients.

"4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, [sic] and causes injury or potential injury to a client."

This standard does not quite fit because we have found that "serious injury" rather than "injury" was caused to these clients.

Application of not only the standards but our previous decisions will result in a sanction greater than a reprimand but short of disbarment. *See In re Bristow, supra.* The Trial Panel set one year as the period of suspension. The Bar has petitioned that we do likewise. We believe that although application of the standards might result in a longer period of suspension, neither the Trial Panel, the Bar nor the accused knew that we would look to the standards when this matter was presented to us.

In this case we accede to the Bar's petition and shall order the accused suspended for a period of one year. As a special condition precedent to reinstatement on the suspension ordered herein, the accused shall be required to pass an examination on professional responsibility administered by the Board of Bar Examiners.[10]

One further matter remains that is somewhat unusual. This accused has been suspended for nonpayment of Bar dues commencing in 1984. He has testified that he now lives in the State of Washington and is not engaged in the practice of law. He swears that he never intends to practice law again. In these circumstances we intend that the one-year suspension shall not commence until he would otherwise be reinstated with respect to his current suspension.

The Bar shall have judgment against the accused for actual and necessary costs and disbursements. ORS 9.536(4).

---

[10] The Trial Panel required the accused, as a condition of reinstatement, to complete successfully a course in legal ethics of an accredited Oregon law school. This could be an insurmountable barrier if no school would accept him for the course. We have no authority to require a law school to accept any given student.