**In re Appeal of PANEL'S AFFIRMANCE OF DIRECTOR OF PROFESSIONAL RESPONSIBILITY'S ADMONITION IN PANEL MATTER NO. 87–22.**

No. C1–87–1617.

Supreme Court of Minnesota.

July 8, 1988.

Michael J. Hoover, Minneapolis, for appellant.

William J. Wernz, Director of Lawyers Professional Responsibility Bd., St. Paul, for respondent.

PER CURIAM.

Appellant A.R. sought review of a decision by a Lawyers Professional Responsibility Board (LPRB) panel affirming an admonition issued by the director in connection with a 1978 business transaction between A.R. and two former clients. We affirm the panel.

I.

Complainant D.E. and his associate T.D. initiated plans for a word processing business in 1975. Their product was a computer program applicable to office typewriters in common use at the time. Recognizing their product would be obsolete within a few years, the two hoped to raise capital quickly through short-term, high-interest notes with individual investors. In 1978, an attorney they met through one of their

potential investors suggested they incorporate, to formalize their structure and address liability, banking, estate planning and usury issues. Having no time or backup to perform the incorporation himself, the attorney referred the pair to A.R. He also loaned them $1,500 under a nine-month note at 100 percent annual interest, later rolling the note into an additional loan at 15 percent interest.

Testimony conflicts about what took place when complainant and his associate met with A.R. sometime in the fall of 1978. Complainant and T.D. claim they initially discussed a loan from A.R. as well as incorporation; A.R. claims he was approached for a loan only later, when he demanded payment for his services. In any event, the partners at some point asked A.R. to loan them his $617 legal fee for incorporation and an additional $1,500, all at 100 percent annual interest for six months. A.R. consented and drafted a promissory note and personal guarantee agreement. He filed articles of incorporation on November 1, 1978. Two days later complainant signed the note on behalf of the corporation, and both business partners signed the guarantee.

From November 1978 through February 1979, A.R. continued to provide legal advice regarding the corporation's borrowing efforts. In January, he reviewed a written proposal to borrow $45,000 in high-interest, unsecured notes. A.R. said he advised against the program based on potential securities law problems, though T.D. understood the advice to be based on administrative and management reasons. During January and February, the corporation borrowed $9,000 from eight individuals, using personally guaranteed notes at 75 to 100 percent annual interest.

The word processing business never got off the ground, and the corporation failed to repay A.R. when his note came due in May, 1979. In June, complainant and T.D.

signed an amended note and confession of judgment, extending the note to August 25, 1979. After the August deadline, complainant assigned his 1978 tax refund to A.R. and agreed to further payments, though A.R. never entered judgment. In 1981, complainant began paying $50 per month, and A.R. ultimately received about $4,650, representing approximately 8 to 10 percent annual interest on his $2,117 loan. As of May 1986 A.R. stated that D.E. still owed him $19,702.50, consisting of $2,957.23 principal[1] and $16,745.27 interest, although A.R. apparently abandoned collection efforts. It does not appear, from the record, that A.R. attempted to collect personally from T.D.

In January, 1986, D.E. consulted an attorney "to clear up my past." On his attorney's advice he stopped making payments to A.R. after January 8, 1986. The attorney also filed a complaint against A.R. with the LPRB, which assigned the case to the district ethics committee. The committee found no misconduct in the fact that A.R. lent his clients money, but felt inclusion of his legal fee in a note at 100 percent interest might create an excessive fee in violation of DR 2–106(A), Minn.Code Prof.Resp. The committee recommended presentation to a panel on that basis.

Instead of presenting charges to a panel, the director issued an admonition for unprofessional conduct of an isolated, nonserious nature, pursuant to Rule 8(c)(2), Rules on Lawyers Professional Responsibility (RLPR). The admonition rested not on an excessive fee, but on A.R.'s entry into a business relationship with a client in which the two had conflicting interests, without full disclosure as to the nature of the conflict—a violation of DR 5–104(A), Minn. Code Prof.Resp. A.R. demanded a panel hearing, as provided in Rule 8(c)(2)(iii), RLPR. After a June, 1987, hearing, the panel affirmed the director's admonition. A.R. filed a notice of appeal in this court under Rule 9(1), RLPR.

1. A.R. also billed complainant $839.90 for collection expenses, adding that amount to the principal on the note.

## II.

A.R. contends violation of DR 5–104(A) is not supported by clear and convincing evidence. He disclaims any conflict of interest arising out of the loan, stressing that his clients never relied on his professional judgment in that matter. We think appellant misunderstands his duty as an attorney when he becomes financially entangled with clients.

Disciplinary Rule 5–104(A) has four elements. It proscribes (1) a business transaction with a client; (2) if the attorney and client have differing interests therein; (3) and the client expects the lawyer to exercise his professional judgment therein for the client's protection; (4) unless the client consents after full disclosure. No one disputes that A.R. had an attorney-client relationship with D.E., T.D. and, subsequently, the corporation. The loan was certainly a business transaction. A.R. suggests, however, that conflict of interest occurs when the attorney acquires client money or property, not when the attorney simply loans money at the client's request. He is correct that most DR 5–104(A) cases involve attorneys who borrow from clients. *See, e.g., In re Pearson,* 352 N.W.2d 415 (Minn. 1984) (client invested in attorney's business); *In re Germundson,* 301 Or. 656, 724 P.2d 793 (1986) (numerous client loans to attorney or businesses in which attorney had an interest). However, it is also clear that a "debtor-creditor relationship is an adverse relationship." *In re Drake,* 292 Or. 704, 714, 642 P.2d 296, 302 (1982). As a general matter, a debtor and creditor have "differing interests." *Id.*

Moreover, courts have found a conflict of interest under DR 5–104(A) based on the attorney's role as a creditor in relation to his client. For example, an attorney had differing interests from his client when he agreed to co-sign her $15,000 loan. *In re Bishop,* 297 Or. 479, 486–87, 686 P.2d 350, 354–55 (1984). She also agreed to pay him $500 for that service, but the conflict centered on the debtor-creditor relationship between them. *Id.* Similarly, an attorney entered a transaction with clients involving conflicts of interest when he made loans totaling $8,000 to be repaid with proceeds from the sale of the client's house. *People v. Stineman,* 716 P.2d 1079 (Colo.1986). Appellant here loaned his clients both his attorney fees for incorporation and an additional $1,500, in a note at 100% interest. As a creditor, his interests necessarily differ from those of the corporation and the individuals who guaranteed the loan, even though the clients initiated the loan.

Did A.R.'s clients expect him to exercise his professional judgment on their behalf regarding the loan transaction? This is perhaps a closer question, as complainant testified he did not rely on A.R.'s advice regarding the loan transaction itself. Nor did these clients have a long history of representation by this attorney, a factor we have previously considered in determining whether the accused was "acting as an attorney" for the business transaction in question. *See e.g., In re Dillon,* 371 N.W. 2d 548, 550 (Minn.1985); *Pearson,* 352 N.W.2d at 419. If A.R. had simply filed articles of incorporation and terminated the attorney-client relationship and then made the loan, we would probably find no basis for disciplinary action.

The evidence shows, however, that neither the attorney-client relationship nor client expectations stopped on the date of incorporation. The clients continued to seek legal advice on their borrowing efforts. A.R. reviewed and commented on their proposal to borrow $45,000 on terms similar to his own note. Whether his advice was good or bad, his position as creditor might affect his professional judgment on those matters. *See Germundson,* 301 Or. at 661, 724 P.2d at 796 (attorney borrowed from client, which might reasonably affect his judgment in subsequent professional tasks for client); *Matter of Reiss,* 101 N.J. 475, 487, 502 A.2d 560, 565 (1986) (attorney's judgement potentially impaired by self-interest when he incorporated client's business, acquired one-quarter interest in the corporation, and donated continuing legal services).

We do not question the propriety of the loan itself. While the interest rate is obviously high, it is comparable to the rate offered other lenders and is consistent with the corporation's goal of raising capital quickly by debt rather than equity funding. Nor is the legal fee for incorporation excessive; the parties agreed on the $617 fee independent of the loan, and no one viewed interest on that loan amount as part of the fee. What we find troubling is A.R.'s failure at least to notify his clients about the potential conflicts between his dual roles as attorney and creditor. While he may not have viewed those roles as conflicting, and arguably no conflict actually occurred, the client deserves a chance to evaluate this question. The attorney, consequently, has an obligation to ensure that clients make a fully-informed choice about entering the transaction after full disclosure.

We recognize attorneys and corporate clients often form relationships that combine legal, financial and other aspects. At the same time, we have warned that an attorney who becomes entangled in his client's business "must meticulously differentiate his role as an attorney from that of a businessman." *Matter of Scallen,* 269 N.W.2d 834, 841 (Minn.1978). One aspect of this duty is explaining to the client how business ties change the nature of the relationship, at least when those ties put the parties in potentially adverse positions. The client may choose this combined attorney-business relationship for any number of reasons, but the attorney may not simply assume the client understood the ramifications of that choice.

Here, A.R. never explained to either complainant or T.D. that his role as their creditor potentially conflicted with his role as their legal advisor and advocate. Indeed, he said he felt such disclosure was unnecessary because he didn't think they ever looked to him to protect their interests "in that aspect of our relationship." However, the two clearly asked for his advice on matters closely related to the creditor-debtor aspect of their relationship. Moreover,

he simply assumed their limited reliance, though from the record, neither client was so obviously sophisticated and knowledgable that such assumption was warranted. In these circumstances, we think any doubts should be resolved in favor of full disclosure.

### III.

A.R. raises other procedural and technical challenges to the panel's affirmance, none of which we find persuasive. His major complaint is the absence of panel findings, which allegedly prevents review of the decision and leaves an inconsistency between the admonition and the panel's affirmance. While the panel's brief report did contain its reasons for affirming the director's admonition, it failed to address disputed testimony or indicate what facts the panel relied on. We urge future panels reviewing a director's admonition to document their decision with greater factual specificity together with reasons. Nevertheless, the panel in this case affirmed a relatively detailed admonition and memorandum, which we interpret as impliedly endorsing the facts and reasoning presented there.

A.R. may also be correct that the panel focused on the conflict inherent in the creditor-debtor relationship, while the admonition pointed more to A.R.'s collection activities after termination of the attorney-client relationship. We simply note that discipline is warranted for failure to disclose potential conflict associated with the loan, not for subsequent collection activities themselves. To the extent the admonition suggests otherwise, it is so modified. *See Complaint of J.G.,* 392 N.W.2d 544, 546 (Minn.1986).

Nor do we find merit in A.R.'s claim that discipline for this isolated, nonserious matter is unfair given the seven-year delay in bringing the action. Absent continuing conduct, excessive delay in prosecuting an attorney discipline complaint could raise equitable concerns. Here, though, A.R. maintained a creditor-debtor relationship with

complainant until at least March 1986, when he apparently abandoned efforts to collect on the loan after complainant stopped payments. In May 1986 in a letter to the District Ethics Committee investigator, A.R. stated that D.E. still owed him $19,702.50, consisting of $2,957.23 principal and $16,745.27 interest. Collection activities during these years are not the basis for discipline, but the continuing relationship undermines any claim that discipline is now somehow prejudicial. All witnesses and relevant documents are still available, and continuing payments on the loan are relevant at least as by-products of appellant's unethical conduct. Delay, on these facts, does not warrant reversal of the admonition.

We therefore affirm the panel.