In the Matter of the DISCIPLINE
OF Thomas F. MARTIN as
an Attorney of Law.

No. 17453.

Supreme Court of South Dakota.

Argued Nov. 17, 1992.

Decided Sept. 15, 1993.

David R. Gienapp, Arneson, Issenhuth, Gienapp & Blair, Madison, Robert G. Fite, Fite and Pierce, Brookings, for respondent Martin.

HENDERSON, Justice (on reassignment).

This is a disciplinary proceeding against Thomas Francis Martin, a member of the State Bar of South Dakota since 1965. By formal accusation, the Disciplinary Board of the State Bar of South Dakota charged Martin with misconduct and drafting various documents and instruments in violation of the Canons of Ethics and the Disciplinary Rules. Martin admitted to preparing the writings, but denied his actions violated professional responsibility.

*PROCEDURAL HISTORY/FACTS*

During the late 1960s, Herman Meyer had been actively selling the farmland which he had accumulated during the previous 30

years. In 1970, the 71 year-old Meyer's sale of ten quarter sections (the Ten Quarter contract) to Martin, for the most part, concluded this liquidation, but was the beginning of events which led to the Board's allegations and this action.

In a seventeen paragraph document, the Board's Formal Accusation lists 12 violations (Counts 4 through 15) of the Canons and the Disciplinary Rules, the majority of which are related to the Ten Quarter contract. With the exception of Count 15, these allegations center on Martin's relationship with Meyer.

Count 4: Martin drafted the Ten Quarter contract wherein he purchased land from Meyer for $230,000.00. Terms included a down payment of .0217%, 5% interest with $5000.00 annual payments for the first ten years of a 27–year payment schedule, an option for Martin to acquire other real estate, and a provision permitting him to pay less than the contract price.

Count 5: Martin subsequently drafted a proposed amendment to the contract wherein the interest rate would be reduced to 4%, and in the event of Meyer's death, extended the contract another 10 years from 27 to 37 years. Although this proposal was not executed, he did alter the annual payments from $5000.00 to a gross receipts formula.

Despite the changes, Meyer received no additional consideration.

Count 6: Similar to Count 5, Martin drafted a proposal abandoning annual payments in lieu of net rentals. Once again, Meyer would receive no additional consideration.

Count 7: In 1972, Martin and Meyer, as business partners, sold 480 acres of land to Eric Balo for $72,000.00 on contract or $60,000.00 in cash. Martin proposed a contract wherein if cash were paid, Meyer would receive the entire amount, but Martin would get $79,000.00 credit on the Ten Quarter contract. This agreement was never executed.

Count 8: Concerning the purchase of property in Brookings, Martin proposed in writing that Meyer pay the entire price in cash with Martin reimbursing Meyer for his share with a promissory note. Meyer was not to receive Martin's share until the property was sold or until he died.

Count 9: Martin, substantially in debt to Meyer, drafted Meyer's Last Will and Testament, dated February 1, 1974. Martin was named Executor and constructive Trustee and thus, was permitted to manage the bulk of Meyer's estate, worth more than $3,000,000.00.

Count 10: Martin drafted a buy/sell agreement for his business dealings with Meyer providing that when one partner died, the surviving partner had the right to purchase the remaining half interest at a sum equal to the original price and terms. This was executed when Meyer was 75 years old, and Martin was 40 years his junior.

Count 11: Similar to Count 8, a real estate purchase with Martin repaying his share to Meyer via a promissory note. This time, Martin gave Meyer the mortgage as collateral. However, two hours prior to recording the mortgage, Martin, on behalf of a Brookings bank, filed a mortgage on the same property, thus giving the bank priority while minimizing the worth of the collateral.

Count 12: Martin arranged for the Liebing Trust to permit his client, and co-trustee, Ruth Liebing to invest $40,000.00 with Meyer in exchange for 80 acres of land as collateral. Unbeknownst to Ruth, the money was actually for Martin, with Meyer acting as a straw man. A letter by Meyer revealed that he did not understand his involvement.

Count 13: Martin used a similar ruse to borrow money from his personal pension plan.

Count 14: In the purchase of a trailer court, Meyer contributed $290,000.00, while Martin only provided $50,000.00. However, they received equal ownership.

Count 15: At various stages in a real estate sale, Martin represented the Farmers Home Administration, the seller, and the buyer, yet never disclosed this multiple representation.

Overall, Board claims that Martin failed to advise Meyer to seek independent counsel, failed to make full disclosure, had conflicting interests, and was guilty of misconduct for

using subterfuge to obtain funds through a straw man. Such deeds constitute multiple violations of Canons 5 and 9, and Disciplinary Rules 1–102, 5–101, 5–104, and 5–105. Based upon these actions and inactions, the Board seeks disbarment. During oral argument, counsel for Martin admitted there were some technical violations. Martin, in his closing statements to the members of this Court, expressed he was sorry.

On July 8, 1992, following a full hearing on this matter, Judge Roland E. Grosshans, appointed as Referee by this Court pursuant to SDCL 16–19–68, found Meyer literate, intelligent, of sound mind, and a client of Martin with respect to his will only; and concluded that Counts 4 through 8, 10, 11 and 14 must fall. Because the Board, through its counsel, agreed that the pension fund loan was not inappropriate, Count 13 was also deemed unfounded. Recommending public censure, the Referee found only Counts 9, 12, and 15 to violate the Rules. At a formal hearing before this Court, Board Counsel James Zieser reiterated the Board's stand for disbarment.

■ Although we give careful consideration to the recommendations of the Board and Referee, we need not give deference to their proposed sanctions. *Matter of Discipline of Stanton*, 446 N.W.2d 33 (S.D.1989). The ultimate decision of discipline rests with this Court. *Discipline of Russell*, 493 N.W.2d 715, 716 (S.D.1992); *Matter of Pier*, 472 N.W.2d 916, 917 (S.D.1991). Upon careful review, we impose a two-year suspension from the practice of law, plus other conditions.

## DECISION

### I

*Counts 4, 5, 6, 7, 8, 10, 11, & 14*

Prior to the Ten Quarter contract being drawn, Meyer had no connection to Martin. Nonetheless, this transaction evolved into a business and friendly relationship between the two. Counts 4 through 8, 10, 11, and 14 deal directly with that relationship which the Referee held to be outside the attorney-client relationship. However, Meyer never received advice on these business matters from any other attorney. Nor does any documentation exist indicating that Martin ever advised Meyer to seek independent counsel or that Martin made full disclosure of the potential for conflict. Although many of the documents encompassed by these accusations were never executed, Martin maintains that the writings were drafted at the request of Meyer. We need not consider the veracity of such a defense because, as a licensed attorney, Martin is well aware that he is to avoid even the appearance of professional impropriety. Canon 9; *Matter of Discipline of Theodosen*, 303 N.W.2d 104 (S.D.1981).

Even if we were to find that the attorney-client relationship did not exist during these particular transactions, Martin still acted as an attorney in drafting the documents. Furthermore, Martin did serve in an attorney capacity with Meyer on other matters, such as preparing his 1972 income tax return and borrowing money from the Liebing trust. Thus, the threshold of attorney-client had been crossed. It appears that Martin was wearing two suits. Disciplinary Rule 5–104(A) advises attorneys about business relations with a client:

> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

We caution attorneys that it is a fine line between attorney and business partner/friend when one serves in a dual capacity with the same person. Whereas Canon 5 states that a "lawyer shall exercise independent professional judgment on behalf of client," Disciplinary Rule 5–101(A) additionally warns attorneys to refuse employment when the interest of the lawyer may impair that independent professional judgment:

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interest.

Martin may have served only as a business partner in most of his dealings with Meyer; however, his skills as an attorney in conjunction with Meyer's age and the extremely favorable terms he received in the contracts, which were not reviewed by independent counsel, create, at the very least, an appearance of impropriety. It may also be safely concluded that Martin was serving two masters at the same time, i.e., himself and his client, Meyer.

Albeit the following parameters of attorney conduct were codified in 1978 at SDCL 16–19–31, subsequent to Martin and Meyer's dealings, they typify the concept of attorney propriety.

> The license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court. It is the duty of every recipient of that privilege to conduct himself at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.

*Matter of Discipline of Dana*, 415 N.W.2d 818, 823 (S.D.1987). Although the Referee found no ethical errors in these Counts, we find that such a conclusion is not supported by the record. *Id.* at 822. Rather, we find Martin's actions suffer from the image of impropriety and a violation of Canon 9. In turn, it causes the image of all lawyers in the State of South Dakota to suffer.

### Count 9

We are likewise convinced that Martin wrongfully obtained a proprietary interest in his client's estate stemming from the provisions of his client's will which he prepared. Essentially, Martin drafted a will placing himself in a position to manage his own heavy debt to Meyer. This constitutes a violation of Canon 5 and DR 5–101. Once again, Attorney Martin should have advised his client to secure independent advice from another attorney; he failed to do so before his client, Mr. Meyer, signed the will. We cannot—we will not—condone this over-reaching activity in the practice of law in South Dakota.

### Count 12

Ruth Liebing, co-trustee of the Liebing estate, had been dissatisfied with the other co-trustee's investment of the trust assets. Martin, attorney for the estate, persuaded Ruth to loan $40,000 of trust fund money to Meyer. In fact, the money was actually to be used by someone else in conjunction with one of Martin's business enterprises. Meyer served only as a straw man to enable Martin to gain control of those funds. Despite this subterfuge, the loan was secured and paid off early.

In disciplinary proceedings, this Court strives to protect the public from the misdeeds or unethical practices by attorneys, and preserve the integrity of the legal profession as a whole. *Pier* at 917; *In re Simpson*, 467 N.W.2d 921 (S.D.1991). By not making full disclosure and failing to obtain Ruth's consent, Martin's misuse of his client's funds to further his own business interests is a violation of Disciplinary Rule 5–104(A).

### Count 13

With respect to Count 13, we adopt the Referee's findings as follows:

> Count XIII concerns Respondent's fully vested pension plan. He had $50,000 in the plan. Tom Martin had Herman Meyer borrow $23,000 from this plan in 1979. Herman Meyer then loaned the $23,000 to Respondent's wife, Judith Martin, as trustee of their educational trust. Tom Martin could have borrowed the money directly, without violating IRS rules and regulations. He used the "straw man" approach to avoid raising the "red flag" that might result in an IRS audit. The Board, through counsel, agreed that the loan was not inappropriate. All deductions, as well as the net gain, were properly reported to the IRS. As a result, this accusation for fraud, deceit or misrepresentation is unfounded.

*Count 15*

When Clifford Leins wanted to sell real estate to a Mr. Peterson, Leins had Martin, his attorney on previous matters, prepare the deed. Leins and Peterson shared Martin's fee. Subsequently, Peterson assumed Leins' debt with the Farmers Home Administration (FHA). Martin was then contacted by the FHA lending institution to do the necessary title work and closing, yet he also represented Peterson on this matter. Thus, Martin represented the FHA, the sellers, and the buyers without making disclosure of the multiple representations. When Peterson defaulted on his contract, Leins, who believed Martin had protected his rights, discovered that the FHA mortgage was superior to his contract rights. Eventually, Leins sued and settled a civil suit with Martin and his malpractice insurance carrier to cure Leins' title problems. Such a problem could easily have been avoided had Martin obeyed his duty to counsel Leins and received Leins' consent to the other representations.

We are convinced that Martin was not up front with his clients, that he failed to inform his clients of whom he was representing and to what extent, and thus, violated Disciplinary Rule 5–105:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under D.R. 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under D.R. 5–105(C).

"Before making a contract with a client, an attorney must fully disclose every relevant fact and circumstance which the client should know to make an intelligent decision concerning the wisdom of entering the agreement."

*Committee on Prof. Ethics v. Mershon,* 316 N.W.2d 895 (Iowa 1982). Attorney Martin did not do so, and his loyalty to a client under this set of facts is shaded by attempting to wear a coat of many colors.

## II

■ The purpose of disciplinary proceedings is not to punish but to remove from the profession those attorneys whose misconduct has proved them unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney so that the public may be protected from further wrongdoing. *Matter of Walker,* 254 N.W.2d 452 (S.D. 1977). Appropriate discipline in any given case necessarily depends upon the seriousness of the misconduct by the attorney and the likelihood of repeated instances of similar misconduct. *Pier* at 917; *Matter of Discipline of Kirby,* 336 N.W.2d 378 (S.D.1983). With the exception of the final allegation, all Counts pertain to Martin's business relationship with Meyer.

When ordering disbarment, it should be clear that the attorney "is one who should never be at the bar; otherwise suspension is preferable." 7 Am.Jur.2d *Attorneys at Law* § 31 (1980). It is extremely unlikely that there will be another Herman Meyer in his life. While this does not excuse Martin's actions, neither do we find these circumstances to warrant disbarment.

■ After reviewing the proceedings below, we are convinced that Attorney Martin's misconduct is of such serious professional nature that, in the best interests of the public and legal profession, it warrants a suspension from the practice of law. *In re Russell,* 493 N.W.2d 715 (S.D.1992); *In re Hopp,* 376 N.W.2d 816 (S.D.1985). A two-year suspension will cause Attorney Martin to realize that the ethics of the legal profession must be maintained and are paramount over money-making in the commercial practice of law. As Justice Holmes once expressed: "We are not mere grubbers in the muckheaps of the world." Our profession is a calling to serve our state and nation. And money is not the solitary goal. It is obvious from the evidence presented that Martin elevated his personal monetary gain over the South Dakota Code

of Professional Responsibility. Under a suspension of two years, Martin may, and should, seriously weigh his professional pursuits in the future. As a middle-aged man, he would still have opportunity to fulfill his destiny in the legal profession. And to good end: To serve the people of this state by diligent and honorable legal effort for his clients. We are not unmindful of Martin's legal talents and work ethic, as found by the Referee. Nor are we calloused to his representations to the Referee of his remorse for the ethical transgressions. Character witnesses appeared on his behalf expressing that he had served his community and handled various legal matters pro bono. He requested compassion from the Referee and desired another chance. He appeared contrite before the Referee and before this Court.

Essentially, this suspension would be imposed and his readmittance to the full practice of law would be conditioned upon the following:

- Attend CLE classes;
- Attend Ethics seminars;
- Pay all costs of these proceedings;
- Pass the Professional Responsibility examination administered by the State Board of Bar Examiners;
- Cooperate with the State Bar of South Dakota in bringing his legal files to a close with counsel satisfactory to clients to accomplish the resolve of any pending litigation or matters not scheduled for litigation;
- Participate in community service work during the 2–year suspension;
- Obtain and maintain legal malpractice insurance or other appropriate security to protect clients.

We conclude that Martin's conduct, as aforesaid, reflects upon his integrity, competency, and fitness to now practice law. *See Matter of Parker*, 269 N.W.2d 779, 780 (S.D. 1978). In keeping with the spirit of our decision, we refer to similar types of ethical transgressions in these cases: *Giovanazzi v. State Bar of California*, 28 Cal.3d 465, 169 Cal.Rptr. 581, 619 P.2d 1005 (1980) (3–year suspension); *In re Conduct of Luebke*, 301 Or. 321, 722 P.2d 1221 (1986) (1–year suspen-

sion); and *Committee On Prof. Ethics v. Mershon*, 316 N.W.2d 895 (Iowa 1982) (formal reprimand).

Accordingly, believing that Attorney Martin's license to practice law should be set aside for a period of two years under the sanction of a two-year suspension, he could appreciate his wrongdoing and rectify his professional ethics by study of the South Dakota Code of Professional Conduct. Upon proper application and compliance with the conditions of readmittance and rectitude, Attorney Martin could again practice law and serve the people of his community and state for many years. SDCL 16–19–83, 16–19–84.

It is so ordered.

MILLER, C.J., and WUEST, J., concur.

AMUNDSON, J., concurs in part and dissents in part.

HECK, C.J., dissents.

HECK, C.J., sitting for SABERS, Justice, disqualified.

AMUNDSON, Justice (concurring in part and dissenting in part).

There is no question that the conduct of Martin in his business dealings with Meyers evinces the pursuit of the American dream, to be successful in pursuing the almighty dollar. This certainly is a pursuit which can become infected by a devouring appetite for success, sometimes commonly referred to as plain and simple greed.

Notwithstanding a record with this flavor, the Referee in this case found credible evidence regarding the manner in which Martin had conducted his life and law practice in the community of Brookings since his admission to the Bar in 1965. For more than twenty-five years, he has gained a good reputation in and around the community regarding his work ethic, personal life, and for providing legal services to those who could not afford them.

The Referee probably placed too much emphasis on the fact that in the bevy of business transactions between Martin and Meyers, Meyers suffered no monetary loss and, in fact, made money on these deals. The mere fact that a client suffers no monetary loss in a transaction involving an attorney has been described by the Minnesota Su-

preme Court as a fortuity which does not absolve one from disciplinary sanctions. *Matter of Discipline of Ray*, 368 N.W.2d 924 (Minn.1985). If an attorney has an interest which adversely affects his judgment or loyalty to a client, that interest will certainly amount to a conflict.

The real blunder in this case is that Martin drafted Meyers' will while he stood to gain as executor of the will and as manager of a major portion of the Meyers estate assets for twenty years. Having placed himself in a position to receive these benefits, Martin still neglected to advise Meyers to seek independent counsel in regards to the will.

The management provision gave Martin sole discretion to invest these estate assets as he saw fit. Martin would have performed these duties while he was substantially indebted to the estate on the real estate contract. A possible scenario in this situation would be negotiating with himself on amending the contract for reduced annual payments, reduced interest, or whatever had not been agreed to by Meyers prior to his demise. A review of the contract and its proposed amendments almost leads one to the conclusion that the legal documents could have been appropriately captioned "adoption papers."

In reviewing disciplinary proceedings, this court determines what is an appropriate discipline from "the whole evidence as submitted[.]" *In re Discipline of Walker*, 254 N.W.2d 452, 455 (S.D.1977). Further, attorneys should be disciplined when they have conducted their practice of law in a manner which fails to comply with the standards of the Code of Professional Responsibility. *In re Discipline of Strange*, 366 N.W.2d 495 (S.D.1985).

This court also attempts to maintain some semblance of consistency in meting out discipline so that the practicing bar is aware of what the consequences will be in the event an attorney violates the standards of the profession. In *Matter of Discipline of Bleeker*, 466 N.W.2d 858 (S.D.1991), the attorney was suspended from the practice of law for six months along with other terms and conditions for: Violating Disciplinary Rule 6–101 of the Code of Professional Responsibility (failing to act competently); Rule 1.1 of the

South Dakota Rules of Professional Conduct (SDCL 16–18 appx.) (competence); commingling client funds with those of his own and failing to keep his client's funds safe and identifiable, in violation of Disciplinary Rule 9–102 (preserving identity of funds and property of a client); Rule 1.15 (fees); was guilty of constructive fraud as found by Davison County's circuit court in violation of Disciplinary Rule 1–102(A)(4) (misconduct involving dishonesty, fraud, deceit, or misrepresentations); and Rule 8.4(c).

After reviewing all of the evidence in this case, I cannot find the conduct of Martin more egregious or more exemplary than the conduct in *Bleeker*. Therefore, I conclude that the appropriate discipline in this case is a six-month suspension from the practice of law. This certainly would seem to be a sufficient time for reflection on his past practices and ample time to renew an acquaintance with the rules of professional ethics. As to the other conditions imposed by the majority, I concur.

HECK, Circuit Judge (dissenting).

I dissent. I would follow the findings, conclusions, and recommendation of the referee, Circuit Judge Grosshans.