2002 SD 112

**In the Matter of the DISCIPLINE OF Jon W. MATTSON, as an Attorney at Law.**

**No. 21767.**

Supreme Court of South Dakota.

Argued April 23, 2002.

Decided Aug. 28, 2002.

that Mattson be disciplined by public censure. SDCL 16–19–35(4). We conclude that suspension from the practice of law for a period of two years is the appropriate discipline under the facts of this case.

## GENERAL BACKGROUND

[¶ 2.] Mattson graduated from the University of South Dakota School of Law in 1967. He began practicing law in Deadwood with D.O. Dellavou. After Dellavou died in an automobile accident in 1968, Mattson served as state's attorney for four years. He practiced alone for a time and practiced with his brother-in-law, Jerry Rachetto, and with Steve Christensen. Christensen left the partnership in 1994 or 1995 and Mattson and Rachetto terminated their partnership in 1994. Since then Mattson has been a sole practitioner.

[¶ 3.] Mattson married Barbara Rachetto in 1962. They have three grown children and four grandchildren. Barbara, a registered nurse, put Mattson through law school. During these disciplinary proceedings she was a Lawrence County Commissioner. She has also always done the book work for Mattson's law practice.

Robert B. Frieberg, Beresford, for Disciplinary Board.

James S. Nelson of Gunderson, Palmer, Goodsell & Nelson, Rapid City, for Mattson.

GILBERTSON, Chief Justice.

[¶ 1.] Pursuant to SDCL 16–19–67, the Disciplinary Board of the State Bar of South Dakota filed a formal accusation against attorney Jon Mattson. The Disciplinary Board recommended that Mattson be suspended from the practice of law for three years. SDCL 16–19–35(2). Following a hearing, the Referee, Circuit Court Judge Rodney J. Steele, recommended

## FACTS SPECIFIC TO THIS COMPLAINT

[¶ 4.] Mattson's uncle, T. Ralph Mattson, was born on November 11, 1904. He was known as Pete Mattson and called Uncle Pete by relatives. He managed a bank in Hot Springs from 1935 until his retirement in the early 1970s.

[¶ 5.] Uncle Pete and his wife, Gertrude, had no children. When she died in 1981, Mattson probated her several hundred thousand dollar estate. Uncle Pete was the primary beneficiary of the estate.

[¶ 6.] Uncle Pete was described as an independent and stubborn man. He did not lead a lavish lifestyle. He was a frugal

man who tended to tightly hang on to his money. While he did give Mattson nominal amounts of money while Mattson was in law school and exchanged Christmas gifts, by Mattson's own account, Uncle Pete was not prone to giving generous gifts.

[¶ 7.] On September 16, 1990, Uncle Pete executed an "Appointment of Guardian" which appointed Norwest Bank, South Dakota, NA, Rapid City, South Dakota or its successor, to be the independent guardian of his person and estate should incompetency proceedings become necessary. The document stated that in making this appointment, "I am not unmindful I have sisters, nieces and nephews, but do not want any of them to be my guardian. In no case whatsoever, shall any or all of my heirs at law, sisters, nieces or nephews, or any members of their families serve as my Guardian."

[¶ 8.] On November 22, 1994, Uncle Pete executed a Last Will and Testament that was drafted by attorney David P. Russell. He gave his house, its furnishings and a lot in Hot Springs to his wife's niece, Gretchen Frey. Specific devises of personal property and money were given to twelve relatives and five charities. The residue of his estate was split between his sister, Mayme, his wife's niece, Gretchen, two grandnieces, and one grandnephew. His sister received 3/10ths of the residue while Gretchen received 2/5ths. The grandnieces, one of whom was Whitney Mattson, the daughter of Mattson's brother, each received 1/10th of the estate as did the grandnephew.

[¶ 9.] The will directed that there be no proration of any federal estate tax or federal inheritance tax. It appointed Norwest Bank to be its independent executor and Mattson to be attorney for the estate. The will specifically provided that Uncle Pete "purposely made no provision for any other person, whether claiming to be an heir of mine or not[.]" Mattson, his wife, children, and grandchildren received nothing under the will.

[¶ 10.] On November 26, 1994, four days after executing the will, Uncle Pete, who was then ninety years old, fell at his home and suffered a head injury which required his hospitalization in Rapid City. He suffered some mental incapacity for the next three months and was physically unable to return home. Mattson and Barbara began managing his assets and arranged for him to move to the Dorsett Health Care facility in Spearfish, South Dakota. He moved there in December 1994.

[¶ 11.] Because both of their mothers live at the Dorsett facility, Mattson and Barbara visited them and Uncle Pete several times a week. They took Uncle Pete to dinner at least twice a week and Barbara took him to medical appointments and did his laundry due to his allergy to soap. He was included in family events. Although his physical health progressively deteriorated, he regularly read Time magazine and the Wall Street Journal and kept up on Nebraska Cornhusker football.

[¶ 12.] On March 16, 1995 Uncle Pete executed a power of attorney drafted by Mattson. It appointed Mattson to be his attorney-in-fact. Uncle Pete executed a durable power of attorney on June 6, 1995. It, too, was drafted by Mattson and appointed him to be Uncle Pete's attorney. Neither power of attorney gave Mattson the authority to make gifts of Uncle Pete's assets to himself or to anyone else. Mattson did not charge Uncle Pete for drafting either document.

[¶ 13.] During the spring of 1995 Mattson began discussing estate planning with Uncle Pete. That summer Uncle Pete gave $5,000 to Mattson and $5,000 to Bar-

bara, the proceeds from negotiated bonds that were cashed.

[¶ 14.] In August 1995 Mattson prepared an inventory of Uncle Pete's assets. On September 20, 1995 he wrote to Uncle Pete, attached the inventory, and suggested that they visit about two methods of reducing his estate in order to save his heirs from federal and state death taxes. He advised Uncle Pete to make gifts or purchase Norwest annuities which, he said, would provide income to him during his lifetime and a nontaxable balance to the beneficiaries.

[¶ 15.] Two months later, on November 22, 1995 Barbara took Uncle Pete to Norwest Bank. Mattson joined them as they met with financial consultant Eric Lee. According to Lee, Mattson made recommendations to Uncle Pete and served as a facilitator while Uncle Pete made the decision to invest in a Franklin Fund annuity. He purchased it for $136,920. Barbara was named as the primary beneficiary; Mattson was named the contingent beneficiary.

[¶ 16.] Between October 23, 1995 and July 29, 1996 Barbara received $6,016 and Mattson a total of $30,552.41 of Uncle Pete's assets in seven transactions. In some instances checks were made payable to Mattson and his wife. While Uncle Pete signed some checks, Mattson signed others using Uncle Pete's name in the signature block with no indication that he was signing on his behalf or pursuant to a power of attorney. In addition, other transactions were completed by cashing negotiated bonds and certificates of deposit and putting the proceeds in the form of cashier's checks payable to Uncle Pete. Mattson then endorsed them by signing Uncle Pete's name, again with no designation of the power of attorney, and deposited the money in his or Barbara's checking account.

[¶ 17.] Mattson drafted a codicil to Uncle Pete's November 22, 1994 will and presented it to him on August 2, 1996. It changed the will in two respects. First, instead of giving Whitney Mattson 1/10th of the residue of the estate, the 1/10th was equally divided between Whitney, Mattson's two sons and three grandsons, and Mattson's brother's grandchild. Second, Mattson replaced Norwest Bank as the personal representative.

[¶ 18.] On August 2, 1996, a series of checks totaling $42,500 were also written on Uncle Pete's accounts. $24,000 was divided among seven relatives. Mattson received $8,500. Barbara was the recipient of $10,000. Mattson does not recall who signed these checks, but Barbara testified that she watched Uncle Pete sign them. Mattson advised the recipients of the checks to hold them until Uncle Pete's Series E bonds were cashed and the proceeds were placed in Uncle Pete's account.

[¶ 19.] On August 3, 1996, the day after the codicil was executed and the checks giving away $42,500 were written, Uncle Pete was rushed to the emergency room due to internal bleeding. He returned to the Dorsett facility two days later and began experiencing periods of confusion and disorientation.

[¶ 20.] Mattson continued to manage Uncle Pete's affairs. On August 5, 1996 Uncle Pete was issued 1,520 shares of First Bank System common stock. That day Mattson went to Uncle Pete's safety deposit box and removed some bonds and a deed executed in 1981 which transferred his house to Gretchen Frey. Mattson negotiated the bonds and filed the deed. A week later, on August 12, Mattson transferred the proceeds of two of Uncle Pete's certificates of deposit that totaled $22,273.43 to Mattson's bank account.

[¶ 21.] On August 26, 1996 Mattson and Barbara were leaving for a fishing vacation in Montana. Mattson wrote a $5,000 check to himself on Uncle Pete's account. On the way out of town he delivered 2,600 shares of Uncle Pete's Norwest stock to Norwest Investment Services. He instructed the service representative to set up two accounts, one for Mattson and Barbara, the other for Gretchen and Don Frey.

[¶ 22.] Uncle Pete died the next day, August 27. He would have been ninety-two years old that November.

[¶ 23.] On September 3, 1996 Mattson, as attorney for the estate, filed an application with the Lawrence County Clerk of Courts seeking informal probate of Uncle Pete's will and codicil and appointment of himself as the personal representative.

[¶ 24.] On September 12, 1996 Mattson signed a letter written and also signed by a Norwest investment services investment officer to Norwest Client Services. The letter directed Client Services to transfer the 2,600 shares of Norwest Corporation stock from Uncle Pete's account and put 1,300 shares in Mattson and Barbara's account and 1,300 shares in the account of Gretchen and Don Frey. Under Mattson's signature, "POA is still in full force and in effect," was typed.

[¶ 25.] Then, on October 4, 1996, the 1,520 shares of First Bank System stock issued to Uncle Pete on August 5, 1996 were reissued. In this transaction five weeks after Uncle Pete's death a) 506 shares were issued to Uncle Pete and Barbara Mattson, joint tenants; b) 506 shares were issued to Uncle Pete and Gretchen Frey, joint tenants; c) 253 shares were issued to Uncle Pete and Jana Nolte, joint tenants; and d) 253 shares were issued to Uncle Pete and Reid P. Edwards, joint tenants.

[¶ 26.] In the course of probating Uncle Pete's estate, Mattson prepared and filed a state inheritance tax report. In it he included a deduction of $6,650 as an overdraft on Uncle Pete's checking account. The account, however, was not overdrawn. He failed to include the transfer of the house to Gretchen Frey and the $136,920 annuity that Barbara was the primary beneficiary of and he, the contingent beneficiary. Mattson paid $68,195.23 in inheritance tax from the residue of Uncle Pete's estate. He did not prorate the tax among the beneficiaries. Neither he, nor any member of his family, paid any inheritance or estate taxes on the non-probate transfers they received.

[¶ 27.] Mattson also filed a federal estate tax return. Once again, the home transfer and annuity were omitted from the return. The certified public accountant who assisted in the preparation of the return testified that the annuity was omitted because Mattson told him that it was a life insurance policy owned by Barbara. Although Mattson signed the federal estate tax return, he cannot recall reviewing it and its schedule requiring the disclosure and reporting of annuities owned by a decedent. The federal estate tax, $12,931, was paid without proration.

[¶ 28.] Mattson paid himself both attorney's fees and executor's fees from Uncle Pete's residuary estate. In October 1998 the final accounting and verified statement for the informal closing of the estate was filed with the Lawrence County Clerk of Courts and served upon the heirs.

[¶ 29.] As a result of the omissions in the state inheritance tax report and federal estate tax return, the amount of state and federal taxes increased. The additional amounts matured after the estate had been distributed to the heirs. Mattson paid $54,903.57 in additional federal tax and $6,181 in additional state tax. He paid

these amounts from his own funds and did not attempt to collect the additional taxes from the other heirs.

[¶ 30.] Mattson moved to a smaller law office in 1998. Among the items he moved were two large filing cabinets filled with Uncle Pete's personal and financial records including over twenty-five years of bank statements and documents. Mattson's term as personal representative would not end until October 1999. Despite this and the fact that he had a barn filled with client files at his home and was notorious for keeping records and not destroying them unless copies were made, Mattson directed Barbara to dispose of Uncle Pete's records in March 1999.

[¶ 31.] On April 27, 1999 Karen Mattson, Whitney Mattson's guardian, filed a claim in Uncle Pete's estate. On June 7, 1999 she initiated a lawsuit against Mattson and Barbara. She claimed that the codicil was invalid as well as several transactions prior to and under the power of attorney. At issue was the validity of Uncle Pete's signatures, an issue made difficult by the destruction of his records, although copies of some checks were recovered from banks. She claimed that Mattson breached his fiduciary duty. She sought damages for the loss of inheritance to which Whitney may have been entitled and made a demand for punitive damages.

[¶ 32.] Following a motions hearing on June 1, 2000, the trial court dismissed the punitive damage claim against Barbara but allowed the claim against Mattson to be submitted to the jury. The court held:

> The claim for punitive damages against Jon Mattson will, in fact, be allowed, by virtue of the relationship of Jon Mattson to Ralph Mattson, not only I guess being a relative of his by blood but by virtue of SDCL Chapter 55–2, which provides for the duties and liabilities of trustees. It provides in there, as you are all aware,

> of certain statutory provisions providing for the duty of a trustee, and under 55–2–7 it provides that every violation of the provisions of 55–2–1 through 55–2–6 is a fraud. So if the jury were to find that the actions of Jon Mattson were in violation of the duties as provided by statute then it's a fraud, and if it's fraud then punitive damages are allowed under our statute.

> Further, under 55–2–8 by virtue of this relationship and the properties that have flowed from the decedent to Jon Mattson there is a presumption of undue influence.

> So I find that pursuant to SDCL 21–1–4.1 that the evidence submitted is clear and convincing, and that there is a reasonable basis to believe there has been willful, wanton or malicious conduct or fraudulent conduct, and therefore I will allow the punitive damages issue against Jon Mattson.

The trial court also ordered that Mattson be removed as the personal representative. He was ordered to pay the successor personal representative $96,200, the value of the Norwest stock, and $30,000, the value of the August 2 checks not paid prior to Uncle Pete's death.

[¶ 33.] The lawsuit on behalf of Whitney Mattson was settled by stipulation on August 2, 2000. The settlement included the payment of $130,000 to Whitney Mattson and $10,000 to Karen Mattson. Mattson borrowed money to pay his $90,000 share of the settlement while his malpractice insurance company paid the balance.

[¶ 34.] The Disciplinary Board concluded that Mattson violated Rules 1.2(d), 1.7(b), 1.8(a)(b) and (c) and 8.4(a)(c) and (d) of the Rules of Professional Conduct, SDCL ch 16–18 Appx. It recommended that he be suspended from the practice of law for three years and not be allowed to

act as a legal assistant during the suspension.

[¶ 35.] After reviewing the facts in this case, the Referee filed a report and recommendation. In it he noted:

> To the objective observer, the above scenario is certainly indicative of someone who at the very least took advantage of his uncle's situation to enrich himself. Although the evidence is not clear and convincing that any influence exercised by [Mattson] was undue to the extent that the transactions should be voided, it does come close. By catering to his uncle and acting as a trusted legal advisor, there is no doubt that the defendant benefited unduly therefrom.

[¶ 36.] Citing *Matter of Discipline of Theodosen*, 303 N.W.2d 104 (S.D.1981) the Referee concluded that Mattson acted inappropriately by receiving fees for acting as both the estate's attorney and the personal representative. He concluded that Mattson violated the fiduciary duty owed a client by his attorney. As power of attorney for Uncle Pete, Mattson had the fiduciary duty to act in the highest good faith and refrain from obtaining any advantage by the slightest misrepresentation or adverse pressure. By not doing so, the Referee concluded that Mattson violated SDCL 55–2–1 and 59–3–11.[1] The Referee also concluded that Mattson violated the spirit of the preamble of the Rules of Professional Conduct, as well as Rules 1.7, 1.8 and 8.4.

[¶ 37.] The Referee recommended that Mattson be disciplined by public censure.

SDCL 16–19–35(4). The Referee did so on the basis that Mattson admitted he acted improperly, the situation involved a relative, the victims had been fully reimbursed by the lawsuit settlement, and Mattson, until now, had a good reputation and no history of disciplinary problems.

## STANDARD OF REVIEW

[¶ 38.] The Disciplinary Board and the Referee conducted detailed hearings and made findings, conclusions and recommendations regarding the appropriate discipline in Mattson's case. Because they had the advantage of seeing and hearing the witnesses, this Court gives careful, due consideration to their findings. *In re Discipline of Light*, 2000 SD 100, 615 N.W.2d 164; *Matter of Discipline of Wehde*, 517 N.W.2d 132 (S.D.1994). We do not, however, defer to a sanction that the Referee recommends. Discipline of Claggett, 1996 SD 21, 544 N.W.2d 878. While we may adopt the Referee's findings, it does not necessarily follow that we will adopt the Referee's recommended sanction. *In re Discipline of Dorothy*, 2000 SD 23, 605 N.W.2d 493. "The final determination for the appropriate discipline of a member of the State Bar rests firmly with the wisdom of this Court." *Wehde*, 517 N.W.2d at 133.

## ANALYSIS

[¶ 39.] The purpose of disciplinary proceedings is to protect the public from fraudulent, unethical or incompetent practices by attorneys. *Matter of Discipline of Kallenberger*, 493 N.W.2d 709 (S.D.1992).

---

1. SDCL 55–2–1 provides:
   In all matters connected with his trust a trustee is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.

SDCL 59–3–11 provides:
An authority expressed in general terms, however broad, does not authorize an agent to do any act which a trustee is forbidden to do by the law on trusts.

They are not conducted to punish the lawyers. *Petition of Pier*, 1997 SD 23, 561 N.W.2d 297.

[¶ 40.] The preservation of trust in the legal profession is essential. *Pier*, 1997 SD 23 at ¶ 8, 561 N.W.2d at 299. Lawyers in the practice of law have a formidable responsibility to protect their clients' "property, their freedom, and at times their very lives." *Matter of Chamley*, 349 N.W.2d 56, 58 (S.D.1984). "Only by providing high quality lawyering can the integrity of the legal profession remain inveterate and the confidence of the public and the Bar remain strong." *Wehde*, 517 N.W.2d at 133.

[¶ 41.] When ninety-year-old Uncle Pete fell on November 26, 1994, his testamentary scheme was in place. His 1990 "Appointment of Guardian" appointed Norwest Bank to be his guardian and directed that "[i]n no case whatsoever" should heirs, including Mattson, serve as his guardian. His November 22, 1994 will which, like the "Appointment of Guardian" document was drafted by attorney David P. Russell, made specific devises to relatives and charities and split the residue among specific relatives. While the will appointed Mattson to be the attorney for the estate, he and his family received nothing under the will. Mattson and Barbara would, however, receive approximately $17,000 as the surviving joint tenants of Series E savings bonds and certificates of deposits.

[¶ 42.] Uncle Pete's testamentary scheme was dramatically altered after Mattson, who was aware of the 1990 "Appointment of Guardian," drafted the first power of attorney in March 1995 and the attorney-client relationship began. Throughout the next eighteen months Uncle Pete's other relatives received nominal amounts while Mattson and Barbara received over $325,000[2] which was half of Uncle Pete's estate. With the exception of the Franklin annuity and four checks, there are no records available to corroborate that Uncle Pete consented to the transfers or beneficiary designations that Mattson made.

[¶ 43.] Throughout these proceedings Mattson has steadfastly maintained that he did not take any action or assist in any gift which was not known, requested, directed or intended by Uncle Pete. He admits that he blurred the relationship between relative and lawyer and that an independent lawyer should have assisted Uncle Pete in changing his testamentary scheme. At oral argument before this Court, a less than remorseful Mattson did acknowledge breaching the Rules of Professional Conduct. He did not acknowledge that he violated any fiduciary duty and contended that Rule 1.8(c) allows gifts to a lawyer from a relative. Because of Mattson's concession, we only address the latter.

[¶ 44.] "The nature of the relationship between attorney and client is highly fiduciary. It consists of a very delicate, exacting and confidential character. It requires the highest degree of fidelity and good faith. It is a purely personal relationship, involving the highest personal trust and confidence." *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259, 264 (S.D.1988). "By virtue of his fiduciary duties to his client, an attorney is forbidden from using his official position for private gain." *Himrich v. Carpenter*, 1997 SD 116, ¶ 13, 569 N.W.2d 568, 572. While representing a client an attorney must not do anything knowingly that is inconsistent with the terms of his employment or con-

---

2. At the Disciplinary Board's hearing Mattson, until prompted by Barbara, did not know what they did with this money. Most of it went into their land development.

trary to the best interests of his client. *Speckels v. Baldwin*, 512 N.W.2d 171 (S.D. 1994). This is "fundamental law." *Speckels,* 512 N.W.2d at 176. When Mattson became his uncle's attorney in March 1995 their relationship went beyond the familial to that of attorney and client. As such, the relationship "is of a confidential and fiduciary nature, that is, it is one of trust and confidence, and in all his relations with his client, it is his duty to exercise and maintain the utmost good faith, honesty, integrity, fairness, and fidelity." 7A CJS, *Attorney & Client* § 234 (1980).

[¶ 45.] We have cautioned attorneys "that it is a fine line between attorney and business partner/friend when one serves in a dual capacity with the same person." *Matter of Discipline of Martin*, 506 N.W.2d 101, 103 (S.D.1993). The same is true with an attorney and a family member.

[¶ 46.] Generally, a lawyer "shall not" represent a client if the representation of the client may be materially limited by the lawyer's own interests, Rule 1.7(b), unless the lawyer reasonably believes the representation will not be adversely affected and the client consents after consultation. Rule 1.7(b)(*l*) and (2). A lawyer's own interests should not be permitted to have an adverse effect on representation of client. Comment, Rule 1.7. "If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." *Id.*

[¶ 47.] In addition, a lawyer "shall not" acquire a pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client,

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

Rule 1.8(a).

[¶ 48.] For less than two years Mattson catered to his infirm, yet capable, ninety-year-old uncle's needs. He served as Uncle Pete's trusted legal advisor. Mattson's ostensible advice to reduce his estate by gift giving in order to reduce inheritance taxes clearly conflicted with Uncle Pete's interest in preserving the estate to pay for his expensive nursing home care. And, the primary beneficiaries of Uncle Pete's gifts were Mattson and his wife who received over half of the estate. At no time did Mattson, who before this time was not an exceptional object of his uncle's bounty, advise Uncle Pete to obtain independent legal advice. Mattson's egregious course of conduct violated Rules 1.7 and 1.8. "We cannot—we will not—condone this overreaching activity in the practice of law in South Dakota." *Martin,* 506 N.W.2d at 104.

[¶ 49.] Mattson, however, claims that his actions were ethically proper under Rule 1.8(c) which provides:

A lawyer shall not prepare an instrument giving the lawyer or person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee.

His contention fails for three reasons.

[¶ 50.] First, Mattson did not prepare "an instrument" to allow the transfer of half of Uncle Pete's estate to himself and Barbara. Rather, he side-

stepped any kind of written document and proceeded by a series of inter vivos transactions using various methods and signatures to transfer funds. Second, we agree with the referee that, Rule 1.8(c) cannot be used to excuse substantial gifts which are facially disproportionate to gifts made to other relatives in the same class. *See,* Restatement (Third), The Law Governing Lawyers § 127(1) (1998)(lawyer may not prepare an instrument effecting gift from client to lawyer, including testamentary gift, unless lawyer is a relative or other natural object of the client's generosity, and gift is not significantly disproportionate to those given to other donees similarly related to donee). Third, the comment to Rule 1.8 does provide that "[a] lawyer may accept a gift from a client, if the transaction meets general standards of fairness." Examples given include a simple gift given at a holiday or as a token of appreciation. The "gift" of over $325,000 to Mattson and Barbara in a short period of time which changed Uncle Pete's long-standing testamentary scheme and was highly disproportionate to Uncle Pete's other heirs clearly does not meet any semblance of a general standard of fairness. It does not constitute simple gift or gifts. *See* Restatement (Third), The Law Governing Lawyers § 127(a) (1998) (lawyer may not accept a gift from a client, including testamentary gift, unless a) the lawyer is a relative or other natural object of the client's generosity, b) the value conferred by the client and the benefit to the lawyer are insubstantial in amount, or. c) the client, before making the gift, has received independent advice or has been encouraged, and given a reasonable opportunity, to seek such advice.)

[¶ 51.] The disciplinary options available to this Court are private reprimand, public censure, placement on probationary status, suspension for up to three years, and disbarment. SDCL 16–19–35. Because of the humiliation he has suffered due to the state-wide publicity in this matter, Mattson urges us to accept the Referee's recommendation of a public censure. While the publicity surrounding this proceeding may have inflicted a harsh personal punishment, "under art V, § 12 of our Constitution, this Court, and not the media nor any third party, is solely charged with the responsibility for determining what is appropriate discipline in an attorney misconduct case." *Matter of Discipline of Hopewell,* 507 N.W.2d 911, 917 (S.D.1993); *In re Discipline of Wilka,* 2001 SD 148, ¶ 17, 638 N.W.2d 245, 250.

[¶ 52.] "Appropriate discipline in any given case necessarily depends upon the seriousness of the misconduct by the attorney and the likelihood of repeated instances of similar misconduct." *Martin,* 506 N.W.2d at 105. In determining the appropriate sanction, this Court reviews the totality of the attorney client relationship to determine if any mitigating factors warrant consideration. *Claggett,* 1996 SD 21 at ¶ 12, 544 N.W.2d at 880.

[¶ 53.] In this case Mattson took advantage of a man he claimed to have a father/son relationship with by engaging in an egregious course of conduct to enrich himself and his wife. He failed to get verification that he was carrying out Uncle Pete's wishes and failed to have an independent lawyer advise Uncle Pete about the financial transactions. In the course of these transactions Mattson breached his fiduciary duties, destroyed records, used the power of attorney after Uncle Pete's death, signed Uncle Pete's name without using his own name with the power of attorney designation, and used cashier's checks so transactions would not go through Uncle Pete's bank records. Mattson elevated his personal monetary gain over Uncle Pete's best interests and over

the Rules of Professional Conduct. *See Martin*, 506 N.W.2d at 105.

To gain [and maintain] admission to the bar, [a person] does not have to fit into any preconceived stereotype. Membership in the Bar should be [as] diverse as is the public it is charged with serving. However, for the legal system to properly function, certain common denominators are mandatory. One of these is that members and applicants for membership, exhibit good moral character. In South Dakota a three piece suit and leather briefcase is not a prerequisite to be a lawyer—good moral character is.

*In re Ogilvie*, 2001 SD 29, ¶ 73, 623 N.W.2d 55, 71 (Gilbertson, J., dissenting)

[¶ 54.] We are not unmindful that Mattson has enjoyed a reputation as a trustworthy and conscientious attorney who does not have a history of disciplinary problems. While this may be relevant in the determination of proper level of discipline, it hardly can rise to the level of exoneration. *See Dorothy*, 2000 SD 23 at ¶ 52, 605 N.W.2d at 503, (20 years of practice without a previous complaint not a basis to avoid professional discipline).

[¶ 55.] We have not ignored the fact that the misconduct arose out of a unique family relationship which will hopefully reduce the likelihood of a repeat occurrence. *See Claggett*, 1996 SD 21 at ¶ 13, 544 N.W.2d at 880. However this argument for leniency was examined at length and rejected as inconsistent with the full justifications for professional discipline in *Matter of Discipline of Tidball*, 503 N.W.2d 850, 856 (S.D.1993):

The scope of our consideration is broader than the current status of the Respondent. The fact that he has effectively removed himself from private practice may protect his would be clients, but all attorneys in this state are subject to these rules and all citizens of this state desire and deserve the protection afforded by the rules. *Matter of Discipline of Bergren*, 455 N.W.2d 856, 857 (S.D.1990) "[A]n application of common sense would show that the discipline for attorney misconduct also serves to deter similar conduct in the profession which, in turn, fosters and maintains the ethics of the legal profession." *Matter of the Discipline of Dana*, 415 N.W.2d 818, 823 (S.D.1987). "The foundation of an attorney's relationship with clients and the legal system is trust." *[Matter of] Pier*, [472 N.W.2d 916,] *supra* at 917 [(S.D.1991)]. Public confidence that the legal profession, under the supervision of this Court, can keep its affairs in order must be zealously maintained. *In re Kunkle*, 88 S.D. 269, 218 N.W.2d 521, 527 (1974), *[Matter of] Walker[, 254 N.W.2d 452 (S.D.1977)]*, *supra*; *[Matter of] Weisensee*, 296 N.W.2d [717] at 722 [(S.D.1980)]. In an age where the legal profession is under heavy attack, a "slap on the wrist … would not lend credibility to the high ethical standards of the profession." *Weisensee*, 296 N.W.2d at 722–723.

*See also Dorothy*, 2000 SD 23 at ¶ 39, 605 N.W.2d at 504–05. Moreover, these acts were not an isolated "foolish and negligent" incident, *id.*, they were intentional and numerous in number. *Hopewell*, 507 N.W.2d at 917.

[¶ 56.] We are also aware that Mattson as a result of his conduct paid substantial additional taxes in regard to this matter to the State of South Dakota and the Internal Revenue Service. Moreover he was sued civilly and ultimately had to settle out of court by paying in excess of $90,000 out of his own pocket. The imposition of discipline is not based on whether the ethical violations resulted in the perpetrator turning a profit on his misdeeds. While payment of the proper amount of tax due and

reimbursing the victims of his acts is appropriate, it does not operate to avoid professional discipline. *Wilka*, 2001 SD 148 at ¶ 17, 638 N.W.2d at 249–50.

[¶ 57.] After reviewing this record, we are convinced that Mattson's professional conduct is "of such serious professional nature that in the best interests of the public and legal profession it warrants a suspension from the practice of law." *Martin*, 506 N.W.2d at 105. A two year suspension will allow Mattson "to realize that the ethics of the legal profession must be maintained and are paramount" over his personal enrichment. *Id.* This sanction is consistent with the ABA Standards for Imposing Lawyer Sanctions[3] and the analogous case of *Martin*, 506 N.W.2d 101.

[¶ 58.] Pursuant to SDCL 16–19–35(2) a judgment of suspension will be entered. In addition, Mattson will be taxed with all necessary costs incurred in this proceeding. SDCL 16–19–70.2.

[¶ 59.] SABERS, KONENKAMP and ZINTER, Justices, and DOBBERPUHL, Circuit Judge, concur.

[¶ 60.] DOBBERPUHL, Circuit Judge, for AMUNDSON, Justice, disqualified.

---

3. Rule 4.12 of these standards provides:
   Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. Rule 4.32 provides:

   Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.